UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID L. RHINEHART and LEWIS
RHINEHART, personal representatives of
the ESTATE OF KENNETH A.
RHINEHART, deceased,

Case No. 11-cv-11254

HONORABLE STEPHEN J. MURPHY, III

    Plaintiff,

v.

DEBRA SCUTT, et al.,

    Defendants.
                                     /

**ORDER ADOPTING IN PART THE MAGISTRATE'S REPORT AND
RECOMMENDATION** (document no. 226)**, GRANTING IN PART AND
DENYING IN PART CORIZON'S MOTION TO DISMISS** (document no. 181)**,
GRANTING AETNA'S MOTION TO DISMISS** (document no. 183)**, AND GRANTING
MDOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** (document no. 184)

    Kenneth Rhinehart was a prisoner at the G. Robert Cotton Correctional Facility ("Cotton Facility"). He suffered from late stage liver failure that ultimately proved fatal. His estate brought various constitutional and tort claims against the doctors and staff at the prison, alleging that they unlawfully denied treatment. Each defendant filed a motion to dismiss or for summary judgment. The Court referred the motions to a magistrate judge, who issued a report and recommendation. Rhinehart filed a timely objection.

**FACTUAL BACKGROUND**

    The Court finds the following facts based on its examination of the entire record:

    Kenneth Rhinehart discovered a tumor growing in his liver in August of 2009. In the days leading to the discovery, pain shot through his abdomen, making it hard to eat. Am. Compl. ¶ 20, ECF No. 175. He visited Dr. Berhane, the physician at the Alger Correctional Facility. *Id.* He told Dr. Berhane that "I think my liver is shutting down," and that he had not

had a bowel movement in a week. *Id.* Ex. A, ECF No. 176. Tests revealed a grapefruit sized tumor growing in Rhinehart's liver. *Id.* ¶ 22. Dr. Berhane noted Rhinehart showed signs of "increased abdominal girth, jaundice, and leg swelling." *Id.* ¶ 25. A subsequent CT scan two weeks later indicated Rhinehart had advanced liver disease. *Id.* ¶¶ 27—28.

The Alger Correctional Facility was ill-equipped to treat serious illnesses. Dr. Berhane therefore arranged to move him to the Cotton Facility, where his needs could be better served. Dr. Berhane explained Rhinehart's condition to Dr. Edelman, one of the physicians at the facility. *Id.* ¶ 30. He also stated that the Alger Correctional Facility would coordinate the transfer with the Cotton Facility's Health Unit Manager and Dr. Stevenson. *Id.*

On October 27, 2009, Rhinehart arrived at the Cotton Facility. *Id.* ¶ 35, ECF No. 175. The policy at the facility was to evaluate each prisoner's health shortly after arrival. *Id.* ¶ 35. After his first week, he still had not been seen by a doctor. On November 2, Rhinehart filled out the first of several medical requests asking be treated. *Id* ¶ 36. The request explained that doctors had transferred him to the Cotton Facility because of his failing liver, that he was in pain, and that he would like to see a doctor. *Id.* Ex. N, ECF No. 176. No one responded to his request.

Instead of treating Rhinehart's tumor, the Cotton Facility assigned Rhinehart to work as a porter. *Id.* ¶ 39, ECF No. 175. The job required him "to lift heavy objects up and down the stairs, which aggravated his increasing pain in his liver." *Id.* When he requested light duty, prison officials threatened to punish him if he refused to work. *Id.*

Over the next few weeks, Rhinehart repeatedly sought treatment for the tumor growing in his liver, as well as the accompanying pain. Doctors cancelled his November 6 appointment without explanation. *Id.* ¶ 37. On November 16, he filed another health care

request. *Id.* ¶ 38. In it, he stated that he had been transferred "so that I could have a surgical biopsy on my liver," but that no doctor had seen him and no biopsy had been scheduled. *Id.* Ex. O, ECF No. 176. Once more, no one responded to his request.

He then wrote a letter to the HealthCare Administrator, Beth Gardon. *Id.* Ex. P. In it he told her of the lesions on his liver, that doctors transported him to the Cotton Facility specifically for liver treatment, that no doctor had looked at him, and that the prison had him doing physical work that exacerbated his condition. *Id.* She never responded.

Throughout December, Rhinehart tried in vain to be examined by a doctor. On December 10, Dr. Stevenson cancelled another appointment without explanation. *Id.* ¶ 42, ECF No. 175. The appointment was rescheduled for the following month, on January 4. Dr. Stevenson could not make that appointment either (once more, Corizon has not provided the reason); instead he asked Dr. Vemuri to see Rhinehart. *Id.* ¶ 45.

At the appointment, Rhinehart told Dr. Vemuri that he was "in severe pain in my liver and abdominal region." *Id.* Ex. W, ECF No. 177. Furthermore, he explained that she was the first doctor that he had seen in two and a half months at the Cotton Facility. *Id.* In her Physical Exam Sheet, she acknowledged the severity of his symptoms, stated that she would make an appointment with an oncologist and promised to do testing the next day. *Id.* Ex. V. She never made the appointment with the oncologist. *Id.* ¶ 45, ECF No. 175. And she did not give him pain medication or request that he be put on light duty. *Id.* ¶ 46.

After the appointment, Rhinehart filed a grievance against Dr. Vemuri for not prescribing pain medication. *Id.* The prison completed the grievance process ten months later, when it stated that the issue had resolved itself because doctors started providing

pain medication at the end of February. *Id.* Rhinehart also wrote letters to the Chief Medical Officer, Dr. Pramslatter, and Chief Legal Counsel, J. Scott Kind. *Id.* ¶¶ 48, 49.

Doctors finally prescribed Rhinehart pain medication on February 22, four months after arriving at the Cotton Facility. *Id.* ¶ 51. They did not put him on light duty until May 24, seven months after entering the prison. *Id.* ¶ 40.

In June of 2010, one month after being put on light duty, Rhinehart was rushed to the emergency room. *Id.* ¶ 53. The veins in his esophagus had swelled into a condition called esophageal varices. *Id.* The veins burst, causing him to nearly bleed to death. *Id.* In June of 2011, Rhinehart was again rushed to the hospital because he was in severe pain and vomiting. *Id.* ¶ 63. In October, Rhinehart collapsed in his cell with severe chest pains. *Id.* Ex. BB, ECF No. 178. According to the Nurse's Report, Rhinehart vomited one liter of blood in his prison cell. *Id.* His cellmate completed an affidavit stating Rhinehart was "crying and moaning, and vomiting up blood into the trash can. Blood was gushing out of his nose and mouth at the same time." *Id.* Ex. AA. He was taken to the hospital, where the doctor told him that the swollen veins in his esophagus had again burst, and that with each subsequent bleeding episode he had a 70% chance of dying. *Id.* Ex. CC. In January of 2013, Rhinehart fell in the shower and broke his hip. *Id.* ¶ 76, ECF No. 175. He was taken to the hospital, where doctors performed surgery. Rhinehart died two weeks later on February 6, 2013. A subsequent autopsy showed that he was killed by a lethal dose of morphine. *Id.* Ex. HH, ECF No. 179.

## PROCEDURAL BACKGROUND

Rhinehart filed this case in 2011. Compl., ECF No. 1. He initially sought a preliminary injunction, asking the Court to "order the defendants to schedule plaintiff to be seen by a

qualified liver specialist," and to be given a liver transplant. Mot. Prelim. Inj. 2, ECF No. 3. The Court denied the motion, explaining that by 2011 the prison was treating him, and that Rhinehart had shown only a difference of medical opinion about the proper course of treatment. Order Den. Prelim. Inj. 4, ECF. No. 127. The Court further noted that "waiting until an adjudication on the merits will not irreparably harm Rhinehart. Nearly two years have passed since Rhinehart filed his initial lawsuit against Defendants, and the dire consequences Rhinehart predicted have not come to pass." *Id.* The Sixth Circuit affirmed in an unpublished opinion in January of 2013. Op. From Sixth Cir., ECF No. 135. But Rhinehart died six weeks later.

In January of 2014, Rhinehart's family filed an amended complaint. Am. Compl., ECF No. 175. The medical providers, including Corizon Medical Services, Dr. Stevenson, Dr. Vemuri, and Dr. Edelman, filed a motion to dismiss under Civil Rule 12(b)(6). Corizon Mot. to Dismiss, ECF No. 181. Aetna, a subcontractor, also filed a motion to dismiss. Aetna Mot. to Dismiss, ECF No. 183. The Michigan Department of Corrections defendants filed a motion for summary judgment. MDOC Mot. Summ. J., ECF No. 184.

The Court referred the motions to a magistrate judge. The magistrate issued a Report and Recommendation, advising the Court to dismiss all claims except an Eighth Amendment claim against Dr. Edelman. Report, ECF No. 226. Rhinehart filed a timely objection. Obj., ECF No. 229.

## STANDARD OF REVIEW

I. <u>Motion To Dismiss</u>

In assessing a motion brought under Civil Rule 12(b)(6), the court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable

inferences from those allegations in favor of the non-moving party. *Bishop v. Lucent Techs., Inc.,* 520 F.3d 516, 519 (6th Cir. 2008). To determine whether Plaintiff has stated a claim, the court will examine the complaint and any written instruments that are attached as exhibits to the pleading. Fed. R. Civ. P. 12(b)(6) & 10(c). Although the pleading standard is liberal, the court need not accept as true any legal conclusion alleged therein, even if couched as a factual allegation. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The Federal Rules of Civil Procedure do not require a claimant to set out in detail every fact upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Bell Atl. Corp. v Twombly,* 550 U.S. 544, 552 (2007) (citing *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). Although "a complaint need not contain detailed factual allegations, its factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Ass'n of Cleveland Fire Fighters v. Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir. 2007) (quotation marks and citations omitted). Therefore, the Court will grant a motion for dismissal under Civil Rule 12(b)(6) only in cases when there are simply not "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.,* 550 U.S. at 570. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal,* 566 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

II.     <u>Summary Judgment</u>

Summary Judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over material facts is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To show that a fact is, or is not, genuinely disputed, both parties are required to either "cit[e] to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). The Court must take care, in evaluating the motion, not to make judgments on the quality of the evidence, because the purpose of summary judgment is to determine whether a triable claim exists. *Doe v. Metro. Nashville Pub. Schs.,* 133 F.3d 384, 387 (6th Cir.1998) ("[W]eigh[ing] the evidence . . . is never appropriate at the summary judgment stage.").

## DISCUSSION

I. Eighth Amendment Claims

The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. Amend. VIII. The Amendment "forbids prison officials from unnecessarily and wantonly inflicting pain on an inmate by acting with deliberate indifference toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). To show that a prison official acted with deliberate indifference, the prisoner must suffer from a "sufficiently

serious" medical condition. *Id.* Furthermore, the prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 896. The standard is satisfied when a prisoner "alleges that prison authorities have denied reasonable requests for medical treatment in the face of an obvious need for such attention where the inmate is thereby exposed to undue suffering or the threat of tangible residual injury." *Scott v. Ambani,* 577 F.3d 642, 648 (6th Cir. 2009) (citations omitted); *see also Blackmore,* 390 F.3d at 899 ("When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity.").

There is no dispute that a grapefruit sized tumor growing in the liver, along with jaundice, leg-swelling, and extreme pain, qualifies as a severe condition. The only dispute is whether each defendant had "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs," and failed to take reasonable, timely steps to treat Rhinehart. *Blackmore,* 390 F.3d at 896 (citations omitted); *Scott*, 577 F.3d at 648 (holding failure to provide pain medication or examine a lump on prisoner's testicle for over three months demonstrated health official was deliberately indifferent to prisoner's needs). A complaint adequately alleges knowledge when the defendant had access to the prisoner's medical records, *Talal v. White,* 403 F.3d 423, 427 (6th Cir. 2005), when the prisoner informed the officials of his condition by filing grievances, *id.* at 428, or when the prisoner made official requests to be seen by a doctor, *Barnett v. Luttrell,* 414 F. App'x 784, 789 (6th Cir. 2011).

    A. <u>Corizon Defendants</u>

1. Corizon

To state a claim against Corizon, Rhinehart must identify official policies, the actions of officials with final decision making authority, a policy of inadequate training or supervision, or a custom of acquiescence of federal rights violations. *See Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005). Liability can also "arise and deliberate indifference can be shown by proof that [Corizon] knows that inmates face a substantial risk of serious harm and disregards the risk by failing to take reasonable measures to abate it." *Blackmore,* 390 F.3d at 900 (citation omitted). In *Blackmore,* the Sixth Circuit found a municipality deliberately indifferent to a prisoner's needs when it "did not have a formal written policy on how to deal with prisoner illnesses, and that the jail's practice was not to provide a substitute nurse if the on-duty nurse calls in sick, resulting in times when a nurse is not on-duty." *Id.* The court found "an issue of fact regarding the total lack of any County policies, practices, and adequate training for this type of constitutional claim." *Id.*

In the present case, the complaint does not adequately allege the physicians' failure to treat Rhinehart was the result of any official policy of Corizon. Indeed, the record is replete with policies designed to ensure prisoners are treated by doctors. For example, doctors were supposed to screen prisoners upon their arrival at the Cotton Facility. Pl.'s Resp., Ex. C ¶ Q, ECF No. 196–3. A complete review of the prisoner's health was to be conducted with 14 days. *Id.* ¶ R. And prisoners had the ability to file medical requests. *Id.* ¶ LL. Furthermore, unlike in *Blackmore,* there is no allegation of a lack of a written policy involving how and when to treat prisoners. And there is no allegation that the Cotton Facility had a practice of not providing substitute nurses or physicians. Finally, there is no allegation that similar incidents were so common that Corizon implicitly acquiesced in

federal rights violations. In short, the problem is not that Corizon failed to have policies protecting prisoners' rights; the problem is that individual doctors failed to implement those policies in Rhinehart's particular case. Accordingly, the Court will dismiss the Eighth Amendment claims against Corizon.

  2. Dr. Stevenson

 The complaint plausibly alleges Dr. Stevenson knew about Rhinehart's condition, yet failed to take any steps to treat him for several months. Before transporting Rhinehart to the Cotton Facility, Dr. Berhane documented the grapefruit sized tumor growing in Rhinerhart's liver, as well as his jaundice, swollen limbs, and extreme pain. Am. Compl. ¶ 25, ECF No. 175. Dr. Berhane transferred Rhinehart to the Cotton Facility specifically for medical treatment. *Id.* ¶ 30. The complaint alleges that Dr. Berhane coordinated the transfer with Dr. Stevenson. *Id.* Once he arrived at the Cotton Facility, Dr. Stevenson appears to be the physician primarily responsible for his care. The complaint states that Rhinehart was scheduled for appointments with Dr. Stevenson on December 10 and again on January 5. *Id.* ¶¶ 42, 45. And Dr. Vemuri described Rhinehart as being "the patient of Dr. Stevenson." *Id.* Ex. W, ECF No. 177.

  Moreover, Rhinehart filed medical requests on November 2 and November 16, explaining that he had late stage liver disease and requesting to see a doctor. *Id.* ¶¶ 36, 38. He also filed a grievance about the lack of any medical treatment. *Id.* ¶ 40; *see Barnett,* 414 F. App'x at 789 ("Barnett alleges that he made Cooper aware of the injury through the health-service request and grievance processes, satisfying the subjective requirement.") These well-pled factual allegations make it not just possible, but plausible, that Dr. Stevenson knew Rhinehart was suffering from a severe medical condition.

Furthermore, Dr. Stevenson's actions exposed Rhinehart to undue suffering. Notwithstanding the large tumor growing in Rhineheart's liver, Dr. Stevenson repeatedly cancelled his appointments without explanation. *Id.* ¶¶ 42, 45. Rhinehart was not prescribed pain medication until February 22, four months after arriving at the Cotton Facility. *See Scott,* 577 F.3d at 648 ("[A] refusal to provide pain medication and to examine his testicular lump for three months could lead a trier of fact to conclude that prison officials exposed Scott to undue suffering or the threat of tangible residual injury.") (internal quotation marks omitted). And Dr. Stevenson did not put Rhinehart on light duty, instead allowing him to work as a porter, carrying heavy boxes up and down stairs, and thereby aggravating his condition. Indeed, Rhinehart was not put on light duty until May 2010, one month before the swollen veins in his esophagus ruptured, causing him to nearly bleed to death. The above allegations are detailed, supported by verifying documents, and satisfy Civil Rule 8's notice pleading requirements. Accordingly, Rhinehart has stated a valid claim that Dr. Stevenson was deliberately indifferent to his serious medical needs.

3. <u>Dr. Vemuri</u>

The complaint plausibly alleges Dr. Vemuri knew the severity of Rhinehart's condition. Dr. Vemuri's notes from the January 4th appointment show Rhinehart had "stage IV fibrosis," "Hep C treatment failure," and a "[h]ighly suspicious finding for a central Cholangiocarcinoma or Klatskin tumor." Pl.'s Am. Compl. Ex. V, ECF. No. 177. Furthermore, Dr. Vemuri's notes recite Rhinehart had been approved to see a specialist, and that she "will make an appointment with Oncologist." *Id.*

Nonetheless, the complaint does not allege that she was deliberately indifferent to Rhinehart's needs. Her only role in his treatment was to see Rhinehart on January 4. And

11

that single appointment was at the behest of Dr. Stevenson. Furthermore there is no evidence that she was involved in his transfer to the Cotton Facility, or that she cancelled his prior appointments. Moreover, she submitted his blood work to be done immediately after the appointment. She also scheduled him for a follow-up examination, and noted that he should see an oncologist. Even though she failed to ultimately schedule the oncologist appointment, Dr. Vemuri's conduct is above the constitutional floor—barely.

B. Aetna

The magistrate judge recommended the Court dismiss the claims against Aetna because Aetna is not a state actor and the complaint "failed to adequately allege that the constitutional deprivations resulted from a deliberately indifferent policy or custom of Aetna." Report 45, ECF No. 226. The Court agrees that the complaint does not allege an unconstitutional policy or custom, and will dismiss the Eighth Amendment claims against Aetna.

Aetna entered into a service provider contract with Corizon, to help them run the prison health care system in Michigan. Aetna Reply, Polisuk Aff., Ex. 1, ECF No. 206–2. The contract requires them to credential doctors, establish "secure units" in local hospitals, and establish a quality assurance program, among other obligations. *Id.* at 2–3.

Though the complaint provides detailed allegations against the physicians, it is silent with respect to Aetna. It does not allege any policy or practice, any acquiescence in the unconstitutional conduct of its employees, or any unconstitutional decisions rendered by policy-making officials. The only relevant allegations surround the existence of a contract and the shortcomings of the doctors that treated Rhinehart. Defendants such as Aetna "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."

12

*Monell v. Dep't of Soc. Serv. of N.Y.C.,* 436 U.S. 658, 694 (1978). Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* Because the Court agrees with the magistrate judge that Rhinehart has not identified any unconstitutional policy or custom, the Court will dismiss the Eighth Amendment claim against Aetna.

### C. Michigan Department of Corrections Defendants

#### 1. Scutt

Rhinehart alleges Defendant Deborah Scutt was the Warden at the Cotton Facility. Am. Compl. ¶ 6, ECF No. 175. The complaint does not mention Scutt again until paragraph 91, when it recites that Scutt was responsible for the well-being and safety of prisoners at the Cotton Facility. *Id.* ¶ 91. Similarly, the record does not provide evidence showing Scutt knew of and disregarded Rhinehart's condition. The evidence shows she was notified that a grievance was resolved. *Id.* Ex. W, ECF No. 177. But beyond that, Rhinehart has not identified evidence showing she was deliberately indifferent to his condition. Accordingly, the Court will dismiss the Eighth Amendment claim against Scutt.

#### 2. Hamblin

Rhinehart's allegations against Nurse Hamblin are likewise insufficient to state an Eighth Amendment claim. Under the MDOC policy directive, prisoners with "routine" ailments are to be seen by a medical provider within five days. Pl.'s Resp., Ex. C ¶¶ MM, NN, ECF No. 196–3. The complaint alleges Hamblin listed Rhinehart's medical condition as routine, even though his "condition was clearly severe." Obj. 23, ECF No. 229. While Rhinehart's condition was objectively severe, the Court is unprepared to say Hamblin's

determination that Rhinehart should be seen within five days—as opposed to the very day of the medical request—shows she was deliberately indifferent to his needs. The complaint also states that she "made verbal threats to [Rhinehart] in reference to his urgent medical request" and told Rhinehart to stop "bugging her." *Id.* ¶ 90, 91. But these allegations are insufficient to prove a constitutional violation. Accordingly, the Court will dismiss the Eighth Amendment claims against Hamblin.

3. Clement, Ives, and Potter

Rhinehart states that while he was at the Cotton Facility, Clement was responsible for medical records, *id.* ¶ 8, Ives was a Nurse Supervisor, *id.* ¶ 9, and Potter was responsible for "Managed Care," *id.* ¶ 11. The complaint does not mention the defendants again until paragraph 97, when it posits that they failed to adequately protect Rhinehart or follow medical guidelines. *Id.* ¶ 97. Furthermore, there is no evidence showing they knew of Rhinehart's condition, were specifically responsible for his care, or were deliberately indifferent to his needs. Accordingly, the Court will dismiss the claims against Clement, Ives, and Potter.

4. Gardon

Beth Gardon was the Health Unit Manager at the Cotton Facility. She filed an affidavit stating that she learned of Rhinehart's situation in December of 2009. MDOC Mot. Summ. J., Gardon Aff. ¶ 10, ECF No. 184–4. She noted that he had been scheduled for multiple doctors appointments, but that the doctors had cancelled for unknown reasons. Upon hearing that no doctor had treated Rhinehart, she scheduled him for an appointment on December 29, 2009. *Id.* ¶ 11. When the doctor cancelled that appointment, she rescheduled it for January 4, when he was seen by Dr. Vemuri. *Id.* Furthermore, Gardon

14

is not a doctor and had no role in diagnosing or treating Rhinehart. *Id.* ¶ 14. In short, Gardon's job was to schedule doctor's appointments with patients, and he was scheduled for at least three appointments before being seen on January 4. The problem was not the lack of scheduling; rather, it was the cancellation of appointments, an occurrence outside Gardon's control. Finally, Gardon retired in October of 2010, and had no role in his treatment after that date. *Id.* ¶¶ 14–15. The Court will dismiss the claims against Gardon.

### D. Conclusion

The Court will dismiss the Eighth Amendment claims against Corizon, Vemuri, Aetna, Scutt, Hamblin, Clement, Ives, Potter, and Gardon. The Court will deny Dr. Stevenson's motion to dismiss. Finally, the magistrate judge recommended denying Dr. Edelman's motion to dismiss. Dr. Edelman did not object to the recommendation. Accordingly, the Court will adopt the recommendation and deny Dr. Edelman's motion to dismiss.

## II. Tort Claims

In addition to the constitutional claims, the complaint alleges torts based on intentional infliction of emotional distress and gross negligence. Rhinehart argues that the claims sound in negligence, not malpractice. But Defendants argue that Rhinehart has brought medical malpractice claims and that he has not complied with Michigan's procedural requirements to bring a medical malpractice suit. The Court agrees with the magistrate judge that exercising jurisdiction over state law claims here would be inappropriate.

28 U.S.C. § 1367(a) grants district courts supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they

form part of the same case or controversy under Article III." District courts have discretion not to exercise jurisdiction when "the claim raises a novel or complex issue of state law" or when "there are other compelling reasons for declining jurisdiction." *Id.* § 1367(c)(1) & (4). When deciding whether to exercise jurisdiction over state law claims, courts evaluate "the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Harper v. AutoAlliance Intern. Inc.,* 392 F.3d 195, 211 (6th Cir. 2004) (citations omitted).

As the magistrate acknowledged, this case presents important state law issues involving the line between gross negligence and medical malpractice. The issues are complicated because the allegations involve multiple defendants acting over a long period of time. Moreover, few Michigan cases offer guidance on how to evaluate gross negligence and medical practice in the prison context, when officials have a unique degree of control over prisoners' access to health care.

In addition, district courts hesitate to exercise jurisdiction over state law claims when there is "likelihood of jury confusion in treating divergent legal theories of relief." *United Mine Workers v. Gibbs,* 383 U.S. 715, 727 (1966). Federal and state law "each have a different focus, and because the two bodies of law have evolved at different times and in different legislative and judicial systems . . . courts and counsel are unduly preoccupied with substantive and procedural problems in reconciling the two bodies of law and providing a fair and meaningful proceeding." *Williams v. VanBuren Twp.,* 925 F. Supp. 1231, 1238 (E.D. Mich. 1996). In the present case, the distinction between gross negligence and deliberate indifference is mired in haze. Both jurors and the Court will have to wade through the murk of independent legal standards that have different focuses, yet often overlap. In

16

the event the case goes to trial, any jury instructions delineating the differences between deliberate indifference, gross negligence, or medical malpractice, would lead to confusion.

The Court acknowledges the case has been with the Court for three years. *See Harper,* 392 F.3d at 211 (noting that the longer the state law claims have been before the court, the more appropriate it is to continue to exercise jurisdiction). The length of time is not dispositive, however, because the litigation is still only at the motion to dismiss stage with respect to the Corizon defendants. Furthermore, the Court acknowledges that Rhinehart will likely file a similar proceeding in state court. Generally, courts avoid unnecessary litigation that wastes judicial resources. But here, some of Rhinehart's claims sound in medical malpractice. And even if the Court exercised jurisdiction over the state law torts, any claims based on medical malpractice would have been dismissed, and Rhinehart would have refiled those claims in state court. Thus, considering there would be duplicate litigation even if the Court exercised jurisdiction, the important state law issues implicated by the case, and likelihood of jury confusion, the Court will dismiss the state law tort claims.

## CONCLUSION

The Court will adopt the magistrate's recommendation to dismiss Count I. That count is based on alleged violations of the Fourteenth Amendment. Rhinehart did not object to its dismissal. The Court will adopt the magistrate's recommendation not to dismiss the Eighth Amendment claims against Dr. Edelman. The Court also agrees with the magistrate that the Eighth Amendment claims against Corizon, Vemuri, Aetna, Scutt, Hamblin, Roberge, Ives, Potter and Gardon should be dismissed. The Court will not dismiss the

Eighth Amendment claim against Dr. Stevenson. Finally, the Court will dismiss without prejudice the tort claims.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that the Magistrate's Report and Recommendation (document no. 226) is **ADOPTED IN PART**.

**IT IS FURTHER ORDERED** that Corizon's Motion to Dismiss (document no. 181) is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that Aetna's Motion to Dismiss (document no. 183) is **GRANTED.**

**IT IS FURTHER ORDERED** that MDOC Defendants' Motion for Summary Judgment (document no. 184) is **GRANTED.**

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: October 21, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 21, 2014, by electronic and/or ordinary mail.

s/Carol Cohron
Case Manager