UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

DAVID L. RHINEHART and
LEWIS RHINEHART,
Joint Personal Representatives
of the Estate of
KENNETH A. RHINEHART,
deceased,

                      Plaintiffs,        Civil Action No.: 11-11254
                                          Honorable Stephen J. Murphy, III
v.                                    Magistrate Judge Elizabeth A. Stafford

ADAM EDELMAN, M.D., and
VERNON STEVENSON, M.D.,

                      Defendants.
_____/

## REPORT AND RECOMMENDATION TO DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [R. 258]

### I.    INTRODUCTION

    Plaintiff Kenneth A. Rhinehart, then a prisoner, filed this action under 42 U.S.C. § 1983 in March 2011, alleging that medical providers associated with the Michigan Department of Corrections (MDOC) denied him necessary medical treatment for his liver diseases.  [R. 1].  After his death in 2013, an amended complaint was filed on behalf of his estate.  [R. 175]. Rhinehart's Eighth Amendment claims against Defendants Adam Edelman, M.D., and Vernon Stevenson, M.D. were the only to survive a motion to

dismiss, [R. 240], and these defendants now ask the Court to grant them summary judgment.[1] [R. 258].  Finding that genuine issues of material dispute remain, the Court **RECOMMENDS** that defendants' motion for summary judgment be **DENIED**.

## II.    BACKGROUND

The following facts are described in a light most favorable to Rhinehart.

Dr. Edelman was the medical director for utilization management for Corizon Health Inc.,[2] a company that was responsible for on-site medical services for all state inmates.  [R. 263-2, PgID 4961].  His job was to review requests for outside treatment, which were generally submitted on a form referred to as a 407.  [*Id.*, PgID 4956, 4958-59, 4966].  Such requests were necessary for a prisoner to be referred to a specialist within Corizon's referral network.  [*Id.,* PgID 4965].  Dr. Stevenson was a Corizon employee, and was the senior physician on staff at Cotton Correctional Center in Jackson, Michigan.  [R. 263-3, PgID 5020; R. 263-4, PgID 5075].  Both Dr.

---

[1] The Honorable Stephen J. Murphy referred this matter for all pretrial proceedings, including reports and recommendations on all dispositive motions pursuant to 28 U.S.C. § 636(b)(1)(B).  [R. 160].

[2] Corizon was previously called Prison Health Services (PHS); this company is referred to as Corizon throughout this report and recommendation.  [R. 263-2, PgID 4957].  Corrections Medical Services (CMS) had held the contract with the MDOC, but PHS/Corizon took it over prior to the events relevant to the instant complaint.  [R. 263-3, PgID 5014- 16].

Edelman and Dr. Stevenson studied internal medicine, but Dr. Edelman's experience was primarily administrative.  [R. 263-2, PgID 4955, 4959-61; R. 263-3, PgID 5014].

On October 8, 2009, Aster Berhane, M.D., documented her conversation with Dr. Edelman regarding transferring Rhinehart from Alger Maximum Correctional Facility in Munising, Michigan to Cotton for "further work up of abnormal liver findings."  [R. 259-1, PgID 4606].  The note stated, "Will expedite process and there will be a coordination of HUM to HUM[3] transfer and MD to MD transfer of pt."  [*Id.*].  Dr. Berhane initiated this action plan after Rhinehart, then 51 years old, had been diagnosed with end stage liver disease with stage IV fibrosis and Hepatitis C, and a radiologist read a CAT (CT) scan as revealing a high suspicion of cholangiocarcinoma or klatskin tumor.  [R. 259-1, PgID 4601; R. 263-9, PgID 5193].  Rhinehart had been experiencing general malaise, weight loss, poor appetite, increased abdominal girth, jaundice and leg swelling. [R. 263-9, PgID 5193].

In addition to discussing Rhinehart's case with Dr. Edelman, Dr. Berhane submitted a request that Rhinehart be referred to an oncologist (cancer specialist) or hepatologist (liver specialist) for a consultation

---

[3] "HUM" is an acronym for health unit manager.

3

regarding a biopsy of his liver.  [*Id.*, PgID 5193-94].  Dr. Berhane was not

the first to recommend that Rhinehart be seen by a specialist; surgeon

Joseph Jameson, M.D., recommended in late September 2009 that

Rhinehart see a hepatologist or oncologist.  [R. 259-1, PgID 4603-05].

       During his deposition, Dr. Edelman denied recalling Dr. Berhane's

discussion with him regarding Rhinehart, although he did acknowledge that

it was uncommon for an on-site medical provider to call him when initiating

a referral request.  [R. 263-2, PgID 4971].  Due to the planned "MD to MD

transfer," Dr. Berhane also contacted Dr. Stevenson directly to inform him

about Rhinehart's medical issues.  [R. 263-3, PgID 5025-26; R. 263-4,

PgID 5079-80].  That type of advance phone call was infrequent, and was

reserved for patients with serious medical needs.  [R. 263-4, PgID 5074].

Additionally, Dr. Stevenson interpreted Dr. Berhane's reference to an

expedited process as meaning that Rhinehart had "very urgent issues," and

recalled that the issue was possible cancer.  [R. 263-3, PgID 5025].

According to Dr. Stevenson, Dr. Berhane needed Rhinehart to be seen

"primarily by a specialist.  Gastroenterologist, hematology, oncology to help

us work up the issues that are going on with the patient."  [*Id.*, PgID 5026].

       As the Health Unit Manager (HUM) of Cotton, Beth Gardon[4] oversaw

---

[4] Her last name is now "Howell," but she will be referred to as HUM Gardon

the entire health care process there.  [R. 263-4, PgID 5058].  She testified that Dr. Stevenson was the doctor assigned to care for Rhinehart, and that another physician should have seen Rhinehart only in an emergency.  [*Id.*, PgID 5060-61, 5096, 5101].  Padmaja Vemuri, M.D., who examined Rhinehart at Dr. Stevenson's request in January 2010, agreed that Dr. Stevenson was Rhinehart's primary care provider the entire time.  [R. 263-5, PgID 5128-29, 5133, 5138-40].  Consequently, Dr. Stevenson was responsible for developing Rhinehart's treatment plan and for his continuing care, and other doctors were only supposed to provide care for him when Dr. Stevenson was not available.[5]  [R. 263-4, PgID 5088; R. 263-5, PgID 5115-16].

Rhinehart was transferred to Cotton on October 26, 2009.  [R. 259-1, PgID 4607].  Cotton had a heavy population of prisoners with multiple medical illnesses, and its policy was to perform a medical intake on incoming prisoners within 24 hours or as soon as possible.  [R. 263-4, PgID 5064-65, 5069].  The nursing staff conducted the intake, assuring that medications were provided for and that appointments were scheduled.  [R.

---

in this report and recommendation.

[5] Stevenson conversely testified that Rhinehart was never totally his patient and, despite the fact that he was the senior physician on staff, he expressed a lack of understanding regarding how the medical providers were assigned.  [R. 263-3, PgID 5027, 5030].

263-4, PgID 5065-66; R. 263-3, PgID 2028].  This system did not work as it should have for Rhinehart.

In November 2009, Rhinehart began complaining that he had not yet seen a doctor, that he was experiencing pain, that he was transferred for the purpose of receiving a biopsy of his liver and that he was concerned with whether it had been scheduled.  [R. 176, PgID 2374, 2376].  On November 23, 2009, almost a month after he had arrived at Cotton, he sent a letter addressed to the health services administrator complaining that he had not yet been screened; that he had been scheduled for a medical appointment on November 6, 2009, but it was cancelled; that, based upon what he had heard from Dr. Berhane, he needed a biopsy in order for a treatment plan to be developed to prolong his life; that he had sent several kites to health care in order to have his needs addressed; and that his porter job required him to lift and carry heavy objects, which was difficult given the increasing pain in his liver, but he would face disciplinary problems if did not perform the job.  [R. 176, PgID 2374; *see also* R. 259-1, PgID 4608].

When the November 23 letter went unanswered, Rhinehart filed a grievance on December 4, 2009, reiterating the complaints made in the letter.  [R. 177, PgID 2380-85].  On December 8, 2009, he received a

6

response to the November 23 letter indicating that his concerns had been

forwarded to his medical services provider (MSP) and that he would be set

up for intake.  [*Id.*, PgID 2392].  Rhinehart was scheduled for a nurse visit

on December 10, 2009, but Gardon noted on December 15, 2009 that his

intake appointments had been cancelled twice, and that she was going to

try to call him out for intake that afternoon, followed by an appointment with

his medical provider (who was identified as Dr. Stevenson).  [*Id.,* PgID

2394, 2396].

It is around this time that the record is clear that Dr. Stevenson

became aware that Rhinehart had arrived at Cotton.  Dr. Stevenson

testified that he did not receive kite notifications or copies of grievances.

[R. 263-3, PgID 5023-24].  However, he acknowledged that Gardon

brought to his attention that Rhinehart had been at Cotton for six weeks

and had not been seen for an intake, to which he responded, "[H]ey, bring

the guy in.  Let's take a look at him."  [*Id.*, PgID 5028-29].  Yet, Rhinehart

was still not scheduled to see Dr. Stevenson until about three weeks later.

[R. 177, PgID 2398].  Further, because he was "too busy," Dr. Stevenson

asked Dr. Vemuri to see Rhinehart instead.  [R. 263-5, PgID 5128; R. 259-

1, PgID 4612-15].

Dr. Vemuri's treatment note from Rhinehart's January 4, 2010

appointment indicates that Rhinehart was complaining about weight loss and discomfort in his hepatic area, and that a request for him to be referred to an oncologist was already approved.  [R. 259-1, PgID 4612-15].  Dr. Vemuri set forth a plan to have the oncology appointment made, to have laboratory testing conducted, and for Rhinehart to have an appointment with the gastrointestinal clinic on about January 25, 2010.  [*Id.*]  Notably, the January 4 examination went forward and the plan was put in place even though, as Dr. Vemuri admitted, she probably did not have Rhinehart's medical file.  [R. 263-5, PgID 5135].

The following day, on January 5, 2010, Dr. Stevenson completed a request to have Rhinehart receive a liver biopsy within one week.  [R. 259-1, PgID 4616-17].  Dr. Stevenson explained, "We're trying to get a piece of tissue so we can better care for what's going on in that area."  [R. 263-3, PgID 5032].  This 407 request went unaddressed and, although Rhinehart had medical appointments with Dr. Vemuri and Zivit Cohen, M.D., in January 2010, those appointments were related to his diabetes and respiratory issues.  [R. 259-1, PgID 4618-24].

According to Dr. Stevenson, the request for a liver biopsy was not approved because Dr. Edelman and Corizon oncologist Richard

8

Kosierowski, M.D.,[6] read Rhinehart's lab work as deeming a cancer diagnosis unlikely.  [R. 263-3, PgID 5032].  However, Dr. Edelman did not officially deny the request; instead, Dr. Stevenson noted six months later that the request was canceled because Rhinehart did not have cancer.  [*Id.*, PgID 5039].  In contrast, Dr. Edelman denied in writing other 407 requests and provided explanations for doing so.  [*See*, e.g., R. 259-1, PgID 4685-86].  It is unclear why the January 2010 request for a liver biopsy was not handled in the same manner.

Dissatisfied with his treatment in general and his January 4, 2010 appointment with Dr. Vemuri, Rhinehart filed a grievance on January 7, 2010.  [R. 177, PgID 2405-06].  He stated that he was experiencing severe pain, but that a nurse told him in December 2009 that she did not have the expertise to prescribe any pain medication.  [*Id.*, PgID 2405].  Rhinehart alleged that Dr. Vemuri did not have his medical file at the time of the cursory examination, and that the doctor did not respond to his request for pain medication.  [*Id.*, PgID 2406].  Since Rhinehart had not been ordered pain medication, the grievance was upheld on January 22, 2010.  [*Id.*, PgID 2407].  Notwithstanding, he was not prescribed medication until a month later, by Dr. Cohen.  [R. 259-1, PgID 4629-32].

---

[6] Dr. Kosierowski's expertise and relationship with Corizon are described in an affidavit he signed in September 2011.  [R. 258-4, PgID 4501-04].

In the interim, on February 16, 2010, Rhinehart had an ultrasound of his liver; Dr. Cohen had requested the procedure earlier that month.  [R. 259-1, PgID 4625-28].  The conditions of Rhinehart's liver lowered the ultrasound's "sensitivity to evaluate for mass," and a contrast-enhanced CT scan was recommended if there was clinical concern.  [*Id.*, PgID 4628].

After Rhinehart sent letters of complaints to medical and legal officials, [R. 177, PgID 2412-18], and filed a *pro se* lawsuit, a Jackson newspaper ran an article on February 21, 2010, stating that Rhinehart probably had cancer and was in pain, but had not been given a referral to a specialist, a liver biopsy, a treatment plan, pain pills or an explanation for the delay.  [R. 263-11, PgID 5388-90].  The article was followed by a call from the ACLU to the Michigan Attorney General's Office, and an assistant from that office wrote in an email on February 22 that the ultrasound from earlier that month was inconclusive.  [R. 263-12, PgID 5393].  He continued, "[U]nless the treatment for this prisoner would not change even if he has a treatable cancer, I think we need to do what can be done to confirm his health status."  [*Id.*]

A February 22 email from Nancy Martin to Angela Martin, who Rhinehart identifies as MDOC's Grievance Coordinator and Quality Improvement Coordinator, respectively, discussed the article and

10

Rhinehart's case.  [*Id.,* PgID 5392].  The email stated that Dr. Edelman had

agreed that Rhinehart would be seen by a hepatologist or oncologist before

he was transferred to Cotton, and that the medical provider at Cotton had

been alerted about Rhinehart's impending arrival.  [*Id.*].  As Nancy Martin

saw it, the issues were the delayed intake and response to the request for

a liver biopsy.  [*Id.*].

MDOC's Chief Medical Officer, Jeffrey Stieve, M.D., wrote to Dr.

Edelman, among others, on the same date that they needed to "rethink our

plan to work on the basis of the ultrasound" and that they should go forward

with a CT scan or a CT scan guided needle biopsy.  [*Id.*]  He continued,

"Until we know what this is, we cannot develop a treatment plan."  [*Id.*].  Dr.

Stieve deemed the matter a top priority.  [*Id.*].  Nonetheless, no CT scan or

biopsy followed this email.

Instead, on February 25, 2010, Dr. Stevenson examined Rhinehart

for the first and only time.  [R. 259-1, PgID 4633-37].  At the time of his

examination, Rhinehart presented with abdominal pain, nausea, bilateral

back and flank pain, blood in his urine and a decreased urine stream.  [*Id.,*

PgID 4633-34].  On the basis of recent lab tests and the February 2010

ultrasound, Dr. Stevenson "reassured" Rhinehart that he did not have a

mass or cancer.  [*Id.,* PgID 4636].  Dr. Stevenson set forth a plan to follow-

11

up in three weeks to document Rhinehart's progress and health status.  [R. 259-1, PgID 4636].

Thereafter, Rhinehart was monitored by Dr. Cohen, who principally treated his pain, first with Ultram and then with methadone.  [R. *Id.*, PgID 4640-60].  Additionally, Rhinehart was finally placed on light work duty on May 4, 2010, by Dr. Cohen; he had complained that his porter job was too difficult for him as early as November 2009.  [*Id.*, PgID 4655-56; R. 176, PgID 2374].  From May 17 to June 17, 2010, the only activity in Rhinehart's medical record appears to be the cancellation of the January 2010 request for a liver biopsy.  [R. 259-1, PgID 4639].

On June 17, 2010, Rhinehart sent a kite stating that he had been experiencing bloating and increased pain in his spleen/liver and in the middle of his solar plexis, and that he felt ill and tired.  [R. 263-9, PgID 5240].  He reported constipation, vomiting and hallucinating, and was transferred to the emergency room of Allegiance Hospital on June 20, 2010, where he was admitted and treated until his June 30, 2010 discharge.  [R. 259-1, PgID 4664; R. 259-2, PgID 4705-08].  Upon admission, Rhinehart's diagnoses included end-stage liver disease with cirrhosis, chronic portal vein thrombosis and chronic hepatitis C.  [R. 259-2, PgID 4705].  He underwent a battery of tests, including a CT scan of the

12

abdomen with contrast, an MRI and an ultrasound, and was found to have no liver mass but extensive portal venous thrombosis.  [*Id.*, PgID 4706].  An endoscopy (EGD) revealed four columns of esophageal varices with no active bleeding,[7] and gastroenterologist Lynn Schachinger, D.O., placed seven esophageal bands with good results.  [*Id.,* PgID 4706-07; R. 177, PgID 2420-21].

In his deposition, Dr. Schachinger explained that an esophageal varicy is a dilated vein in the esophagus, and Rhinehart's varices resulted from his cirrhosis causing pressure in the veins.  [R. 263-13, PgID 5399].  Varices carry a risk of bleeding, and that risk increases along with the increase of pressure and sizes of the varices.  [*Id.*].  The goal of esophageal banding is to obliterate the varices.  [*Id.*].

In his discharge notes, Dr. Schachinger noted that Rhinehart was at a high risk for bleeding from his esophageal bleeding and recommended that he "should followup [sic] as an outpatient with the prison gastroenterologist for additional EGD with esophageal banding as necessary."  [R. 259-2, PgID 4706; R. 177, PgID 2421].  Dr. Schachinger testified that, if he had a

---

[7] Rhinehart represents that he experienced an esophageal bleed in June 2010 and that his October 2011 esophageal bleed, described below, was a "re-bleed." However, the June 2010 EGD report indicates that Dr. Schachinger found and banded esophageal varices, but that "[t]here was no active bleeding."  [R. 177, PgID 2421.]

patient with Rhinehart's conditions under his exclusive control, he would

have reevaluated Rhinehart's varices a month later and would have

referred him to a tertiary care center that performs liver transplants.  [R.

263-13, PgID 5400].

Nonetheless, Dr. Stevenson did not submit a request that Rhinehart

have a follow-up visit with a gastroenterologist or any other specialist

before he left his employment with Corizon in August 2010.[8]  [R. 258-6,

PgID 4513].

In June 2011, Rhinehart returned to Allegiance Hospital's emergency

room and was once again admitted after experiencing increased abdominal

pain and distension.  [R. 178, PgID 2437-40].  An MRI showed a "markedly

abnormal liver with findings likely representative of slowly progressive

hepatocellular carcinoma, evidence of extensive tumor infiltration of the

liver . . . tumor extension of the porta hepatis and portal vein," and

"progression of disease on comparison with previous imaging of June

2010."  [*Id.*, PgID 2437].  A CT guided biopsy was negative for a

malignancy, but the gastroenterologist's discharge plan included a repeat

---

[8] At the hearing regarding the motion for summary judgment, defendants
argued, and Rhinehart did not deny, that Dr. Schachinger's
recommendation that Rhinehart follow up with a gastroenterologist would
not have been brought to Dr. Edelman's attention without the issuance of a
407 form request by Dr. Stevenson or another onsite provider at Cotton.

MRI of the abdomen and pelvis in four weeks and, if Rhinehart's tumor

worsened, an evaluation at a tertiary care center.  [*Id.*, PgID 2437, 2439].

This recommendation was followed up on; a request for Rhinehart to have

an MRI of the liver was approved by Dr. Edelman on July 5, 2011.  [R. 259-

1, PgID 4675-76].

The results of the July 21, 2011 MRI that followed were unchanged in

comparison to the one completed that June, and continued to show a large

mass that was consistent with an "infiltrating malignancy like hepatocellular

carcinoma or cholangiocarcinoma."  [R. 259-1, PgID 4677].  The MRI also

indicated that the portal vein was occluded.  [*Id.*].  Nancy McGuire, M.D.,

who was now Rhinehart's medical provider, discussed his case with Dr.

Edelman after this MRI and after blood work was completed on August 5,

2011.  [*Id.*, PgID 4677-78].

Due to a then pending motion for temporary restraining order

requesting that Rhinehart be seen by a hepatologist, oncologist or qualified

liver specialist to be evaluated for a liver transplant, [R. 79],[9] Dr. Edelman

and Dr. Kosierowski signed affidavits in August 2011 stating that Rhinehart

did not need to see an outside specialist because he likely did not have

cancer and he was an unlikely candidate for a liver transplant due to his

---

[9] The motion was denied. [R. 127].

low MELD (Model for End-State Liver Disease) score.  [R. 258-4, PgID 4500-09].  They also noted that he was scheduled for an open liver biopsy; that biopsy was conducted on September 7, 2011, and confirmed that he did not have cancer.  [*Id.*; R. 259-1, PgID 4680-81].

On October 12, 2011, Dr. Edelman saw Rhinehart through telemed. [*Id.*, PgID 4682].  Dr. Edelman discussed Rhinehart's complaints of abdominal pain, assuring that they would look into treatment options, but also expressing doubt that Rhinehart was experiencing pain.  [*Id.*]. Rhinehart requested a lower dosage of the beta-blocker that was prescribed as a prophylaxis for variceal bleed because the regular dose was causing him respiratory problems; Dr. Edelman agreed.  [*Id.*] Lastly, Dr. Edelman rejected Rhinehart's request to see an outside hepatologist so that he could pursue a liver transplant, stating that his liver health disqualified him, and assuring him that the prison medical staff was capable of providing his necessary treatment.  [*Id.*].

On October 13, 2011, Dr. Edelman rejected two 407 requests – one for an MRI of the liver and the other for a barium swallow test – opining that neither was medically indicated.  [R. 259-1, PgID 4683-86].  Two weeks later, on October 26, 2011, Rhinehart was readmitted to Allegiance Hospital because he had abdominal pain, was pale, had cool skin and low

blood pressure and had begun vomiting blood clots – about a liter's worth. [R. 259-1, PgID 4687-88; R. 259-2, PgID 4711-13].  Dr. Schachinger performed more esophageal banding, which had good results, but he recommended that Rhinehart be immediately transferred to a tertiary care center to undergo a TIPS[10] procedure to prevent further bleeding, as further banding could not be done.  "The patient's prognosis is quite poor and guarded at this time and there is a fair chance that this is going to bleed again and he may bleed to death and I recommend that he be transferred."  [R. 259-2, PgID 4713].

A TIPS procedure is used to decompress the pressure in the portal vein to decrease risk of bleeding.  [R. 263-13, PgID 5403].  At his August 2015 deposition, Dr. Schachinger testified that the TIPS procedure was medically the right move because Rhinehart had severe varices, and each re-bleed increased his risk of death by 15%.  [*Id.*, PgID 5400, 5403]. Notably, Dr. Schachinger also opined that, if Rhinehart's varices had been monitored after the first banding and additional banding had occurred (as Dr. Schachinger had recommended), the October 2011 bleed could have been prevented.  [*Id.*, PgID 5411].  Generally speaking, had Rhinehart been followed by a gastroenterologist after the initial banding, as Dr.

_____

[10]"TIPS" is the acronym for Transjugular Intrahepatic Portosystemic Shunt.

17

Schachinger had recommended, he may have had fewer complications from his liver disease, even if his overall mortality was not affected.  [*Id.,* PgID 5400].  According to Dr. Schachinger, additional banding was no longer an option; without the TIPS procedure, Rhinehart had a fair risk for a re-bleed that could kill him.  [R. 259-2, PgID 4713].

Yet, to the surprise of hospitalist Mohmmed Al-Shihabi, M.D., Dr. Edelman rejected Dr. Schachinger's recommendation to transfer Rhinehart to a tertiary care center for a TIPS procedure.  Dr. Al-Shihabi wrote that Dr. Edelman "denied this transfer and he said that we just need to continue monitoring the patient here, even though Dr. Schachinger said that if the patient bleeds he cannot do to [sic] anything and the patient will be unstable to be transferred or do anything and the patient will die."  [R. 259-2, PgID 4715].  Dr. Edelman agreed that this was an accurate summation of their conversation.  [R. 263-2, PgID 5000].

Dr. Al-Shihabi's appeal to Dr. Stieve, MDOC's Chief Medical Officer, also fell on deaf ears.  [R. 259-2; R. 259-1, PgID 4689].  Describing Rhinehart's risk of re-bleed as "hypothetical," which was contrary to the assessment of Dr. Schachinger, Dr. Stieve stated that he and Dr. Edelman concluded that the TIPS procedure posed risks to Rhinehart's morbidity and mortality.  [R. 259-1, PgID 4689].  Further, although Dr. Edelman had

18

not examined Rhinehart and did not have expertise with respect to esophageal varices, he nonetheless opined that Dr. Schachinger could have re-banded Rhinehart if he suffered a re-bleed, notwithstanding Dr. Schachinger's determination otherwise.  [R. 263-2, PgID 5000, 5002].

After he was returned to Cotton, Rhinehart was prescribed beta blockers to "minimally reduce the pressure on his varices," but they caused him general malaise and shortness of breath.  [R. 259-1, PgID 4690].  He requested the TIPS procedure, but was advised that it would not "definitively" prolong his life or improve its quality.  [*Id.,* PgID 4961, 4693, 4697].

Dr. Edelman's employment ended in February 2012.  [R. 263-2, PgID 4959].  Almost a year later, in January 2013, Rhinehart slipped and fell on a wet surface and broke his hip.  [R. 179, PgID 2463-64, 2476].  Rhinehart agreed to a surgical repair after acknowledging his understanding that he had a higher chance of death from the surgery because his esophageal varices may re-bleed.  [*Id.,* PgID 2477-79].  A surgeon described Rhinehart's "devastating problem" in that he stood a high risk of death whether or not he underwent surgery.  Without the surgery, he would not survive because his "esophageal varices [ ] could let loose at any time and lead to his demise. . . .  He is basically waiting for his varices to explode

19

and for him to die." [*Id.*, PgID 2479].

Rhinehart did not survive the surgery; he died on February 6, 2013. The Jackson County medical examiner performed an autopsy the following day, and determined that his cause of death was cirrhosis of the liver. [R. 258-3, PgID 4488-99]. Forensic pathologist Werner Spitz, M.D. performed a second autopsy on February 8, 2013, which he acknowledged posed more difficulties than an initial autopsy. [R. 263-15, PgID 5445-46]. Dr. Spitz opined that Rhinehart died because his liver could not metabolize and normally eliminate the morphine that was used to control his pain, causing a morphine overdose. [*Id.*, PgID 5446]. In addition, Dr. Spitz found that the absence of evidence of a TIPS procedure was noteworthy.

> Patients who suffer from esophageal varices are frequently given a TIPS, which is a radiological procedure, which cannot only alleviate the risk of harm and the symptoms associated with his medical conditions (varices, portal hypertension, etc.) but also, to my knowledge, is often used as a gateway for people awaiting liver transplantation to prolong life.

[*Id.,* PgID 5445]. Dr. Spitz believed that patients with advanced cirrhosis due to hepatitis C, like Rhinehart, commonly receive liver transplants and the long-term survival rates are relatively high. [*Id.*, PgID 5446].

Gastroenterologist Stuart Finkel, M.D., who issued an opinion on Rhinehart's behalf, described the TIPS procedure as a minimally invasive catheterization that is performed by a radiologist, and that Rhinehart had an

excellent chance of surviving the procedure because of his low MELD

score.  [R. 263-10, PgID 5380-81].  Dr. Finkel took issue with Dr.

Edelman's decision to disregard Dr. Schachinger's opinion given that Dr.

Schachinger was a liver specialist and had personally examined Rhinehart.

[*Id.*, PgID 5882].  According to Dr. Finkel, Dr. Edelman's decision to deny

the TIPS procedure prolonged Rhinehart's pain and suffering from portal

hypertension, and caused him to spend the final year of his life in constant

fear of a "likely fatal variceal hemorrhage."[11]  [*Id.,* PgID 5383].

## III.    ANALYSIS

### A.

"The Court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See also*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986); *Pittman v.*

*Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723

(6th Cir. 2011).  A fact is material if it could affect the outcome of the case

based on the governing substantive law.  *Anderson*, 477 U.S. at 248.  A

dispute about a material fact is genuine where "the evidence is such that a

---

[11] Defendants' expert gastroenterologist, Michael Duffy, M.D., opines that Rhinehart would not have been a candidate for a TIPS procedure.  [R. 258-9, PgID 4540-46].  However, the Court must view the evidence in a light most favorable to Rhinehart.

reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a summary judgment motion, the Court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88(1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

**B.**

Rhinehart's claim arises under 42 U.S.C. § 1983, which creates a cause of action against any person who, under color of state law, deprives another of a right secured by the Constitution or laws of the United States. *Broyles v. Corr. Med. Services, Inc.*, 478 Fed. Appx. 971, 974 (6th Cir. 2012). It is well-established that a prison official's "deliberate indifference" to an inmate's serious medical needs constitutes "unnecessary and wanton infliction of pain" in violation of the Eight Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

A deliberate indifference claim under the Eight Amendment has an

22

objective and a subjective component.  *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  The objective component requires a plaintiff to allege that the medical need at issue is "'sufficiently serious.'"  *Id.* at 702-03 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  *Comstock*, 273 F.3d at 703.  However, a plaintiff does not have to show that the prison official acted "for the very purpose of causing harm or with knowledge that harm will result."  *Farmer*, 511 U.S. at 835.  Rather, a plaintiff need only show that the official "recklessly disregard[ed]" a substantial risk of serious harm.  *Id.* at 836.

Defendants do not challenge that Rhinehart suffered from a sufficiently serious medical condition so as to satisfy the objective component of the deliberate indifference test.  Instead, they argue that there is no genuine dispute pertaining to their alleged deliberate indifference, that Rhinehart cannot show that their alleged deliberate indifference was the proximate cause of his claimed injuries, and that he cannot demonstrate that they caused him a physical injury as required by 42 U.S.C. § 1997e(e) in order to recover for his mental or emotional

injuries.  Defendants' arguments fail to address the legal standard that is

applicable when a plaintiff alleges a delay or denial of treatment of a

serious medical need that has been diagnosed by a physician as

mandating treatment.  Application of that legal standard is essential for the

proper analysis of Rhinehart's case, so that is where the Court will begin.

## C.

In *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001), the

court held that, in order to satisfy the objective component of a deliberate

indifference claim, a plaintiff complaining of delay in medical treatment

"must place verifying medical evidence in the record to establish the

detrimental effect of the delay in medical treatment to succeed."  (citation

and internal quotation marks omitted).  However, the Sixth Circuit later

clarified that the "verifying medical evidence" standard applies only to

"those claims involving minor maladies or non-obvious complaints of a

serious need for medical care."  *Blackmore v. Kalamazoo Cty.*, 390 F.3d

890, 898 (6th Cir. 2004).  The *Napier* standard does not apply when the

medical need at issue "has been diagnosed by a physician as mandating

treatment *or* one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention."  *Id.* at 897 (citation and

quotation marks omitted) (emphasis in original).

*Blackmore* held that a plaintiff whose medical condition has been diagnosed or is obvious need not show that his medical condition worsened; "[i]t is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id.* at 900. The court concluded, "Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the 'detrimental effect' of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm." *Id.* at 899.

Importantly and contrary to defendants' argument otherwise, the plaintiff need not prove that the defendants' acts or omissions proximately caused physical injury or death when the delay or denial of medical treatment constitutes the constitutional infirmity. *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) (estate did not need to prove that denial of care for obvious medical need proximately caused death); *Cooper v. Cty. of Washtenaw*, 222 Fed. Appx. 459, 471-72 (6th Cir. 2007) (requiring proof of direct causal effect or injury for failure to address obvious medical need "improperly injects a proximate cause discussion into our deliberate indifference analysis").

25

*Blackmore, Owensby* and *Cooper* all pertained to cases in which the injury was allegedly obvious to a lay person.  However, *Blackmore* placed medical conditions diagnosed by a physician as mandating treatment in the same category as those that are obvious to a lay person.  *Blackmore*, 390 F.3d at 897.  Therefore, the same analysis applies for a medical need diagnosed by a physician; if the medical condition has been diagnosed by a physician as mandating treatment, the failure to address the medical need in a reasonable time frame constitutes the constitutional infirmity, and proof that the acts or omissions of the defendants proximately caused physical injury or death is not required.

As applied here, defendants' no-harm-no-foul defense is off the mark. Rhinehart is not required to prove that the alleged failures to address his medical needs in a reasonable time frame resulted in untreated cancer, a re-bleed of his varices, the deprivation of a liver transplant, death, or any other detrimental effect.  The question at hand is whether there is a material dispute that defendants' acts or omissions delayed or denied Rhinehart medical care for conditions that had been diagnosed by physicians as mandating treatment so as to expose him to a substantial risk of harm; exposing him to those harms constitutes the constitutional infirmity.  With the issue framed in this manner, the Court recommends that

26

summary judgment be denied with respect to both defendants.

**D.**

Viewing the evidence in a light most favorable to Rhinehart, a reasonable jury could find that Dr. Stevenson delayed and denied Rhinehart medical treatment in a manner that constituted deliberate indifference.  Dr. Stevenson was Cotton's senior physician, was assigned as Rhinehart's primary care provider and had prior knowledge of Rhinehart's "very urgent" medical issues that demanded attention, perhaps by specialist.  [R. 263-3, PgID 5020, 5025-26; R. 263-4, PgID 5060-61, 5075, 5079-80, 5088, 5096, 5101; R. 263-5, PgID 5115-16, 5128-29, 5133, 5138-40].  Thus, Dr. Stevenson had a duty to address Rhinehart's medical needs within a reasonable time frame.  Given that, his argument that he provided Rhinehart with very little care, [*see* R. 258, PgID 4474-76], does not aid his defense.

As previously noted, Dr. Stevenson may not have been aware that Rhinehart had been transferred to Cotton until mid-December 2009.  [R. 263-3, PgID 5028-29].  At that time, Gardon informed Dr. Stevenson that Rhinehart had been transferred to Cotton six weeks earlier but had not had intake, [*Id.*, PgID 5028-29], but Dr. Stevenson still did not assure that Rhinehart's urgent medical needs were addressed in an urgent manner.

27

Instead, because he was "too busy," Dr. Stevenson had Dr. Vemuri examine Rhinehart on January 4, 2010, and Dr. Vemuri did not even have the benefit of Rhinehart's medical chart.  [R. 263-5, PgID 5128, 5135; R. 259-1, PgID 4612-15].  It is true that Dr. Stevenson completed a request for a liver biopsy in order to "better care for what's going on in that area."  [R. 259-1, PgID 4616-17; R. 263-3, PgID 5032].  But after that request was reportedly unofficially rejected by Dr. Edelman, [R. 263-3, PgID 5032], Dr. Stevenson did nothing further to determine what was "going on in that area."

Nor did he do anything to address Rhinehart's pain; Rhinehart's grievance that he had been denied pain medication was upheld, but even then it took Dr. Cohen to prescribe pain medication a month later.  [R. 177, PgID 2407; R. 259-1, PgID 4629-32].  It took Dr. Cohen to place Rhinehart on light duty in May 2010, even though Rhinehart had been complaining since November 2009 that his porter job was too difficult.  [R. 259-1, PgID 4655-56; R. 176, PgID 2374].  Dr. Cohen also ordered the ultrasound of Rhinehart's liver in February 2010, but the results were inconclusive, and the emails between the Attorney's General's Office, MDOC personnel and Dr. Edelman later that month reveal that nobody knew the status of Rhinehart's liver and that there was no treatment plan.  [R. 259-1, PgID

28

4625-28; R. 263-12, PgID 5392-93].

Notably, a reasonable jury could reject Dr. Stevenson's testimony that Dr. Edelman and Dr. Kosierowski had already determined in January 2010 that Rhinehart did not have cancer, and that that is the reason that the liver biopsy Dr. Stevenson requested was deemed not necessary.  [R. 263-3, PgID 5032].  In the February 2010 emails, Nancy Martin identified the primary issues as including the delayed liver biopsy and Dr. Stieve recommended going forward with a CT scan or a CT scan guided biopsy.  [R. 263-12, PgID 5392-93].  Dr. Edelman, who was a party to those emails, did not respond at that time that a liver biopsy was unnecessary or that medical evidence suggested that Rhinehart did not have cancer.  Further, when Dr. Stevenson finally examined Rhinehart on February 25, 2010 for the first and only time, he relied upon the February 2010 ultrasound and lab test to conclude that Rhinehart did not have a mass or cancer.  [R. 259-1, PgID PgID 4636].  The February 2010 ultrasound did not exist when, according to Dr. Stevenson, Dr. Edelman rejected the January 2010 request for a liver biopsy.

Moreover, Dr. Stevenson's reliance on the February 2010 ultrasound to determine that Rhinehart did not have cancer was questionable.  The radiologist found that the conditions of Rhinehart's liver lowered the

ultrasound's "sensitivity to evaluate for mass," and Dr. Stieve concluded

three days prior to the February 25 appointment that they needed to rethink

their reliance on that ultrasound; the radiologist and Dr. Stieve both

suggested that they needed a CT scan or CT guided needled biopsy.  [R.

259-1, PgID 4628; R. 263-12, PgID 5392].  Nonetheless, Dr. Stevenson

relied upon the inconclusive ultrasound and did not request the suggested

testing; he simply "reassured" Rhinehart that he did not have cancer and

established a plan for continued monitoring.  [R. 259-1, PgID 4636].

Dr. Stevenson could also be found by a jury to have been deliberately

indifferent when he failed to request a referral to a gastroenterologist after

Dr. Schachinger's warned in June 2010 that Rhinehart carried a high risk

for esophageal bleeding and therefore should be followed by a

gastroenterologist, [R. 259-2, PgID 4706; R. 177, PgID 2421].  His failure to

implement the course of action recommended by Dr. Schachinger, a

specialist, to prevent Rhinehart from suffering an esophageal bleed is

enough alone to establish deliberate indifference to Rhinehart's serious

medical needs.  *See LeMarbe v. Wisneski*, 266 F.3d 429, 438 (6th Cir.

2001) (doctor's failure to refer to specialist who could prevent substantial

risk of serious harm amounted to deliberate indifference); *Hammonds v.

L.P.N. John*, No. 3:15-CV-01141, 2016 WL 109976, at *2 (M.D. Tenn. Jan.

8, 2016) (doctor's refusal to implement ophthalmologist's recommended treatment could establish deliberate indifference); *Verser v. Elyea*, 113 F. Supp. 2d 1211, 1215 (N.D. Ill. 2000) (failure to follow recommendations of orthopedic specialist was deliberate indifference); *Lowe v. Vadlamudi*, No. 08-10269, 2009 WL 736798, at *9 (E.D. Mich. Mar. 16, 2009) (failure to refer to specialist for care outside of MDOC medical service provider's expertise amounted to the denial of medical care altogether).[12]

Unfortunately, Dr. Schachinger assessment that Rhinehart faced a high risk for an esophageal bleed was accurate; he suffered such a bleed in October 2011.  [R. 259-1, PgID 4687-88; R. 259-2, PgID 4711-13]. While it is true that Dr. Stevenson left the employ of Corizon in August 2010, he is nonetheless responsible for his actions and omissions prior to that date, including his abdication of his responsibility to determine the status of Rhinehart's liver and provide appropriate treatment, and his disregard for Dr. Schachinger's recommended course of treatment.

**E.**

The Court does not agree with Rhinehart that Dr. Edelman's denial of

---

[12] It may be that Dr. Stevenson should have sought a referral to a specialist earlier, as recommended by Dr. Berhane and Dr. Jameson in 2009.  [R. 263-9, PgID 5193-94, R. 259-1, PgID 4603-05].  These recommendations suggest that Rhinehart needed care outside of the expertise of MDOC physicians.

407 requests for an MRI and a barium swallow test in October 2011 constituted deliberate indifference; the denial of those tests amounted to a mere disagreement among medical professionals.  "A difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to serious medical needs."  *Acosta v. Naphcare*, No.2:09–cv–1998, 2010 WL 3522356, at *5 (D.Nev. Sept.2, 2010) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989)); *see also Douglas v. Stanwick*, 93 F.Supp.2d 320, 325 (W.D.N.Y.2000); *Brewer v. Blackwell*, 836 F.Supp. 631, 644 (S.D.Iowa 1993).  The same analysis does not apply to Dr. Edelman's failure to approve the requests for a liver biopsy and his refusal to approve Dr. Schachinger's request to transfer Rhinehart to a tertiary care center for a TIPS procedure; a jury may find that those actions and omissions constituted deliberate indifference to a substantial risk of harm.

When Dr. Berhane contacted Dr. Edelman in September 2009 about Rhinehart's urgent medical issues, including the CT scan results that were "highly suspicious" for cancer, she simultaneously requested that Rhinehart be approved for a liver biopsy.  [R. 259-1, PgID 4601; R. 263-9, PgID 5193-94].[13]  Another request for a liver biopsy was made in January 2010, this

---

[13] In February 2010, Nancy Martin wrote that Dr. Edelman had approved

time by Dr. Stevenson.  [R. 259-1, PgID 4616-17].  Then, in his February

22, 2010 email to Dr. Edelman and others, Dr. Stieve suggested that they

go forward with a CT or a CT guided needle biopsy.  [R. 263-12, PgID

5392].  There is no documentation in the record to explain why Dr.

Berhane's request for a biopsy was not honored, why Dr. Edelman did not

approve Dr. Stevenson's request for a biopsy in January 2010, or why Dr.

Edelman did not follow up on Dr. Stieve's suggestion that they go forward

with a biopsy the following month.  As noted, the evidence does not

establish that the suspicion of cancer had been ruled out at the time of

these requests.  A reasonable jury could find that Dr. Edelman knowingly

and unreasonably denied or delayed the requests for a biopsy despite the

CT scan that raised a suspicion of cancer.

Dr. Edelman could also be found to have been deliberately indifferent

when he denied Rhinehart the transfer to a tertiary care center for the TIPS

procedure in October 2011.  Dr. Edelman knew that Dr. Schachinger had

indicated that he could not do any further banding and that, in the absence

of a TIPS procedure, Rhinehart could bleed to death.  [R. 259-2, PgID

4713, 4715; R. 263-2, PgID 5000].  Dr. Edelman did not have expertise

---

Dr. Berhane's request for a liver biopsy.  [R. 263-12, PgID 5392].  However,
the disposition of Dr. Berhane's request is not included on the form.  [R.
263-9, PgID 5193-95].

with respect to esophageal varices and, even though he had not seen the condition of Rhinehart's liver, he inexplicably rejected Dr. Schachinger's first-hand expert opinion that further banding could not be done.  [R. 263-2, PgID 5000, 5002].

Dr. Edelman's rejection of Dr. Schachinger's recommended course of action to prevent a fair risk of death is not a mere disagreement among physicians.  It is more akin to the facts of *LeMarbe,* where the treating physician failed to refer a plaintiff with a bile leak in his abdomen to a specialist to stop the leak, and summary judgment on the deliberate indifference issue was denied.  *LeMarbe*, 266 F.3d at 438.  This case is also analogous to *Verser,* where a non-specialist, non-examining physician allegedly refused to follow the recommendations of an orthopedic specialist, and the plaintiff was found to have stated a claim of deliberate indifference.  *Verser*, 113 F.Supp.2d at 1215.

According to Dr. Edelman, the ultimate authority for rejecting Dr. Schachinger's recommendation for the TIPS procedure laid with Dr. Stieve. [R. 263-2, PgID 5000].  However, hospitalist Dr. Al-Shihabi's report indicates that Dr. Edelman provided the initial rejection, and Dr. Edelman described Dr. Al-Shihabi's summary of their conversation as accurate.  [*Id.*; R. 259-2, PgID 4715].  In addition, as the medical director for utilization

management for Corizon who was responsible for referring prisoners to

outside specialists, [R. 263-2, PgID 4961, 4965], Dr. Edelman cannot

simply disclaim responsibility for his decisions.  In light of his (and Dr.

Stevenson's) attempts to shuck off responsibility for Rhinehart's treatment

and treatment decisions, the "basic message" of *Hadix v. Caruso*, 461 F.

Supp. 2d 574, 598-99 (W.D. Mich. 2006), bears repeating:

> You are valuable providers of life-saving services and
> medicines. You are not coatracks who collect government
> paychecks while your work is taken to the sexton for burial. If a
> patient does not receive necessary medical or psychological
> services, including medicines and specialty care, it is not his
> problem, it is your problem, a problem that must be solved at
> lunch, nights or weekends, if necessary. If someone in the
> bureaucracy, including [Corizon],[14] is stopping you from
> providing necessary services in a timely way, or stopping the
> patient from obtaining necessary specialist care or medicine,
> you should pester the malefactors until they respond and the
> services are provided.

**F.**

As described above, the Court finds that Dr. Stevenson and Dr.

Edelman delayed or denied Rhinehart medical care that created a

substantial risk of serious harm.  Further, contrary to defendants' argument,

there is evidence that Rhinehart suffered physical injuries, as required by

Section 1997e(e), in order for him to maintain his action for mental or

---

[14]This opinion pertained to a pattern and practice of non-treatment on the
part of CMS, Corizon's predecessor.

emotional damages.[15]  The physical injury required by Section 1997e(e)

need not be significant, but it must be more than *de minimis*.  *Jarriett v.*

*Wilson*, 162 Fed. Appx. 394, 400 (6th Cir. 2005)

Here, the record establishes that Rhinehart suffered untreated pain

from the time of his transfer to Cotton until February 2010; the traumatic

October 2011 esophageal bleed, which Dr. Schachinger testified could

have been prevented had his June 2010 recommendation for continued

monitoring by a gastroenterologist been followed, [R. 263-13, PgID 5411];

as well as general malaise and shortness of breath from the beta blockers

that Dr. Edelman prescribed to reduce pressure in Rhinehart's varices,

instead of the TIPS procedure, [R. 259-1, PgID 4690].[16]  Dr. Spitz and Dr.

Finkel both opined that Rhinehart unnecessarily suffered from symptoms

that would have been alleviated by the TIPS procedure, including pain and

portal hypertension.  [R. 263-10, PgID 5380-81; R. 263-15, PgID 5445-46].

These alleged injuries are not *de minimis*, and defendants' argument that

Rhinehart cannot recover emotional or mental damages pursuant to

---

[15] Section 1997e(e) states, "No Federal civil action may be brought by a
prisoner confined in a jail, prison, or other correctional facility, for mental or
emotional injury suffered while in custody without a prior showing of
physical injury . . . ."
[16] Dr. Edelman was aware prior to denying the TIPS procedure that beta
blockers caused Rhinehart to experience respiratory distress.  [R. 259-1,
PgID 4682].

Section 1997e(e) should be rejected.

## IV.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that defendants'

motion for summary judgment [R. 258] be **DENIED**.

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: April 7, 2016

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Either party to this action may object to and seek review of this

Report and Recommendation, but must act within fourteen days of service

of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ.

P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any

further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v.*

*Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*,

638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but

fail to raise others with specificity will not preserve all objections that party

might have to this Report and Recommendation.  *Willis v. Secretary of*

*HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers*

*Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection

must be served upon this Magistrate Judge.  E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2,"
etc., and **must specify** precisely the provision of this Report and
Recommendation to which it pertains.  Not later than fourteen days after
service of objections, **the non-objecting party must file a response** to
the objections, specifically addressing each issue raised in the objections in
the same order and labeled as "Response to Objection #1," "Response to
Objection #2," etc.  The response must be **concise and proportionate in
length and complexity to the objections**, but there is otherwise no page
limitation.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served
upon counsel of record and any unrepresented parties via the Court's ECF
System to their respective email or First Class U.S. mail addresses
disclosed on the Notice of Electronic Filing on April 7, 2016.

s/Marlena Williams_____
MARLENA WILLIAMS
Case Manager