UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID L. RHINEHART and LEWIS
RHINEHART, Joint Personal
Representatives of the Estate of
KENNETH A. RHINEHART, Deceased,

Case No. 2:11-cv-11254

HONORABLE STEPHEN J. MURPHY, III

        Plaintiffs,

v.

DEBRA SCUTT, et al.,

        Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' SECOND MOTION
## FOR SUMMARY JUDGMENT [340] AND FINDING OTHER MOTIONS MOOT

Before the Court is Defendant's second motion for summary judgment. The first was referred to the magistrate judge, who issued a report and recommendation ("Report") suggesting the Court deny the motion. ECF 273. The Court adopted the Report over Defendants' objections, ECF 284, and preparations for trial commenced. Extensive motion practice ensued and at least one additional deposition was taken. Also during that time, the Court of Appeals for the Sixth Circuit issued an opinion that addressed one of the central legal theories in this case. *See Mattox v. Edelman*, 851 F.3d 583 (6th Cir. 2017), *reh'g denied* (Apr. 6, 2017). Subsequent to the decision, Defendants filed a motion for leave to file a second motion for summary judgment in light of the appellate decision and new testimony. The Court granted leave and laid out the discrete issues that needed to be addressed. Both parties filed briefs and the Court held a hearing. The Court must grant Defendants' motion.

## STANDARD OF REVIEW

Summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material for purposes of summary judgment if its resolution would establish or refute an "essential element[] of a cause of action or defense asserted by the parties[.]" *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the Court must view the facts and draw all inferences in the light most favorable to the non-moving party. *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And although the Court may not make credibility judgments or weigh the evidence, *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015), a mere "scintilla" of evidence is insufficient to survive summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff," *Anderson*, 477 U.S. at 252.

## BACKGROUND

The facts of the case have been fully set forth several times. *See, e.g.*, ECF 273. In very brief summary: Kenneth Rhinehart was an inmate at a state prison in Munising, Michigan when he was first diagnosed with End-Stage Liver Disease (ESLD). Prison medical personnel began treating him for the condition, but in September 2009, a CT scan revealed some abnormal liver findings that suggested Rhinehart might have cancer, so he was transferred to the JCF facility in Jackson, Michigan that October to be seen by a liver

specialist or cancer specialist. The case concerns the treatments he did and did not receive from the time of his transfer until his death in February 2013 following hip surgery.

**DISCUSSION**

I.     The Standard for Deliberate Indifference Claims

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment and applies to the States through the Fourteenth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 101–02 (1976). The Supreme Court has held that deliberate indifference to the serious medical needs of a prisoner constitutes "unnecessary and wanton infliction of pain" and therefore violates the Eighth Amendment. *Id.* at 104. Still, this does not transform medical malpractice claims into constitutional violations "merely because the victim is a prisoner." *Id.* at 106. Rather, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.*

To prevail on a claim of deliberate indifference, a plaintiff must satisfy objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component requires the existence of a "sufficiently serious" medical need, while the subjective component requires that prison officials had "a sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004).

The Sixth Circuit "recognizes two theories under which a plaintiff can demonstrate the objective component of an Eighth Amendment deliberate indifference claim." *Mattox*, 851 F.3d at 598. One is to show that the medical need "has been diagnosed by a physician as mandating treatment." *Id.* When proceeding under that theory, a plaintiff must show that prison officials either entirely failed to treat the condition, or treated it inadequately.

3

*Blackmore*, 390 F.3d at 898. In the latter case, a plaintiff must introduce "medical proof" that a delay in treatment caused a serious medical injury or that "the provided treatment was not an adequate medical treatment of his condition[.]" *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). The other route is to show that the claimed injury or illness was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention[.]" *Id.* at 590. In those cases, the plaintiff must simply show that he "actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id.*

The question now before the Court is whether any of the alleged shortcomings in Rhinehart's treatment satisfy the objective component under any theory. Plaintiffs have made clear that they are not arguing about delays in treatment, *see* ECF 349, PgID 8849, and Plaintiffs' counsel stated flatly at oral argument that they do not claim Rhinehart had an obvious medical need that any lay person would recognize. So Plaintiffs have one option: they must show that Rhinehart's needs were diagnosed by physicians as mandating treatment and that Defendants failed to treat him or so inadequately treated him that he suffered a verified medical injury.

I.    The Claims

Plaintiffs' theories of liability have vacillated. But at the hearing, Plaintiffs clarified their eight theories of liability:

1.  Stevenson failed to make accommodations to receive Rhinehart.

2.  Stevenson failed to ensure that Rhinehart was seen by a specialist after he became aware of Rhinehart's arrival at JCF.

3.  Stevenson failed to create a meaningful plan of care for Rhinehart's ESLD, including portal hypertension, ascites, and EV.

4. Stevenson failed to order monitoring by a gastroenterologist after his June 2010 EGD.

5. Stevenson failed to request any specialist consultations after Rhinehart's June 30th discharge.

6. Edelman failed to act after learning, in February 2010, that Rhinehart had not seen the recommended specialists.

7. Edelman failed to approve a TIPS procedure.

8. Edelman failed to approve Rhinehart's requests to be seen by a hepatologist for evaluation and treatment of his liver disease, including consideration for a possible liver transplant.

Nowhere in their case is a claim based on a delay in cancer diagnosis or Rhinehart's fear of cancer. While the cancer claims were a central component of the magistrate judge's analysis on the initial summary judgment motion and in the Court's adoption of the Report, Plaintiffs have decided to no longer pursue them. The Court therefore considers the claims abandoned and will review Defendants' second motion in light of what Plaintiffs' case actually is.

1. Stevenson failed to make accommodations to receive Rhinehart

Plaintiffs argue that "Stevenson was the physician assigned as primary provider for Mr. Rhinehart" and was "responsible for developing the initial treatment plan" for Rhinehart after his transfer. ECF 349, PgID 8856–57. They also argue that Rhinehart was supposed to be seen right away, since he was transferred on an "expedited" basis. Accordingly, they fault Stevenson for failing to make arrangements for Rhinehart to see specialists shortly after his arrival. Defendants dispute that Stevenson was Rhinehart's assigned physician, and that there were "assigned physicians" at all. But even so, they argue that Plaintiffs' claim fails because Rhinehart was treated for his diagnosed conditions and suffered no harm from any delay or treatment choice.

Although the Sixth Circuit has rejected "the notion that a prison doctor who delays treatment may escape liability simply because the treatment was recommended rather than prescribed," *Santiago*, 734 F.3d at 590, the court has also emphasized that "where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Thus, when a deliberate-indifference claim is "based on the prison's failure to treat a condition adequately . . . medical proof is necessary to assess whether the delay caused a serious medical injury." *Blackmore*, 390 F.3d at 898 (citing *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001)). When, therefore, medical personnel recommend a specialist referral in the ongoing treatment of a diagnosed condition, the verifying-medical-evidence requirement applies. To conclude otherwise would undermine the body of established case law permitting prison doctors to accept or reject recommendations in their medical judgment. *See, e.g.*, *Estelle*, 429 U.S. at 107 (holding that the decision not to order "additional diagnostic techniques or forms of treatment . . . is a classic example of a matter for medical judgment.") *and Howze v. Hickey*, No. 10-CV-094-KKC, 2011 WL 673750, at *9–10 (E.D. Ky. Feb. 17, 2011) (finding no Eighth Amendment violation when treating doctor rejected the treatment recommendation of outside specialists).

Rhinehart was being treated for longstanding ESLD and Hepatitis C before his transfer to JCF. A suspicion of cancer arose in the course of that treatment when a CT scan revealed "abnormal liver findings." *See* ECF 259-1, PgID 4601, 4606. Rhinehart was

then transferred to JCF to allow for a further "work up" of the findings. *Id.* at 4606. The medical providers' suspicion of cancer, however, was not a new diagnosis, and their recommendations that Rhinehart see an oncologist or hepatologist were not "mandated treatments." Rhinehart in fact never had cancer, so there simply cannot be any medical proof of injury resulting from inadequate cancer treatment.

As for ESLD and Hepatitis C (the diagnosed conditions that did mandate treatment), Rhinehart *was* seen and treated after his arrival at JCF. While he was not seen by medical personnel for several weeks after his transfer, and he was not seen by Stevenson for longer, he was in fact treated.[1] For instance, Dr. Vemuri saw Rhinehart on January 4 and 19, 2010, ECF 259-1, PgID 4612–15, 4618–21; medical personnel performed an ultrasound of Rhinehart's liver in February 2010, *id.* at 4627–28; and in June 2010, Rhinehart underwent several tests, including an MRI, CT scan, an endoscopy, and another ultrasound, ECF 259-2, PgID 4706. Even if Stevenson was specially responsible for making accommodations for Rhinehart in advance of his transfer, Plaintiffs have not introduced medical proof of injury resulting from the lack of accommodations. Stevenson is therefore entitled to summary judgment on the claim.

2. Stevenson failed to ensure that Rhinehart was seen by a specialist after he became aware of Rhinehart's arrival at JCF

Rhinehart was eventually seen by specialists, so Plaintiffs' no-treatment theory necessarily fails. Conceivably, the claim could be understood as faulting Stevenson for failing to have Rhinehart seen by a specialist "on an expedited basis," but that theory also

---

[1] Plaintiffs have resisted the limitation of Rhinehart's conditions to ESLD and Hepatitis C, and insisted the various complications that arose from those two conditions are themselves independent medical conditions. But the distinction is of no import in the short time frame applicable to the failure-to-accomodate theory. And Rhinehart's treatment concerning the separate complications is discussed further below.

fails because a specialist's recommendation is not a diagnosed need mandating treatment. Dr. Berhane's recommendation that Rhinehart be seen by specialists—even on an arguably expedited basis—was merely a recommendation that his treating physicians at JCF could accept or reject in the course of further evaluation and treatment. Rhinehart was seen by doctors and he received treatment. Stevenson is therefore entitled to summary judgment on the claim.

   3.  Stevenson failed to create a meaningful plan of care for Rhinehart's ESLD, including portal hypertension, ascites, and EV

All the parties agree that Rhinehart had at least two diagnosed conditions prior to 2009: End-Stage Liver Disease (ESLD) and Hepatitis C. But Plaintiffs also point out that ESLD has many known complications—for instance, portal hypertension and ascites. *See* ECF 349, PgID 8845. They argue that "each of the serious complications caused by his ESLD created a separate serious medical need" and then accuse Stevenson of failing to treat the separate complications. *Id.* at 8846. Defendants insist that the only diagnosed needs mandating treatment were ESLD and Hepatitis C and that the deliberate-indifference analysis should be based on the treatment Rhinehart received for those two conditions, and not complications individually.

Although Plaintiffs frame Stevenson's[2] duty as one to create a "meaningful plan of care," the real question before the Court is whether Rhinehart had a condition that was diagnosed by a physician as mandating treatment—yet did not receive the treatment. *Mattox*, 851 F.3d at 598.

---

[2] It bears noting that Defendants challenge whether this inquiry is appropriate at all because, in their view, Stevenson was not specially responsible for Rhinehart's overall care and therefore not responsible for developing treatment plans for Rhinehart. The Court need not resolve that question here, but will proceed through analysis on the assumption that Stevenson did have a supervisory role.

The complications noted by Plaintiffs are interconnected. ESLD leads to, or includes, cirrhosis of the liver. ECF 345-2, PgID 8739–40. Cirrhosis, in turn, can lead to portal hypertension: a form of high blood pressure. *Id.* at 8740. The strain of the hypertension can then result in ascites, which is the accumulation of fluid, or esophageal varices (EV)—dilated veins. *Id.* The build-up of ascites can cause discomfort, while the harmful, painful, and sometimes deadly consequence of EV is burst veins and bleeding as a result. *Id.*

Rhinehart certainly received care; the record is replete with notes from various doctors evaluating his symptoms, prescribing drug protocols, and recommending treatments. And the complications listed by Plaintiffs are recurrent in the records; they are simply considered alongside Rhinehart's other diagnoses and conditions. For instance, Dr. Stevenson listed "hypertension" among Rhinehart's diagnoses, noted that it was "improving" and included his general treatment plan. ECF 259-1, PgID 4636. Dr. Vemuri's report also listed essential hypertension among Rhinehart's diagnoses, but as not otherwise specified, *id.* at 4612, and she later noted that the degree of control of the hypertension was "good," *id.* at 4620. Dr. Cohen described Rhinehart's hypertension as "malignant" and therefore recommended a decrease in one of Rhinehart's medications. *Id.* at 4641.

Similarly, Rhinehart's ascites was repeatedly addressed by his doctors, though unlike his hypertension, ascites was often listed as a "symptom" while the doctors discussed the broader conditions of Hepatitis C and ESLD or cirrhosis in their notes. *See id.* at 4675, 4636, 4664. It therefore seems more appropriate to consider ascites as a complication, the treatment of which was subsumed in the general medical judgment of the physicians as

they treated the underlying, diagnosed condition. Regardless, Rhinehart's ascites did not go unchecked. Dr. Berhane recognized that Rhinehart had "mild ascites" as early as August 2009, *id.* at 4602, and two months later she noted mild ascites among other symptoms such as "mild jaundice" and malaise, ECF 263-9, PgID 5192–93. Rhinehart continued to be monitored for ascities as part of his broader care over the following years: Stevenson noted that ascites was "not present" in February 2010, ECF 259-1, PgID 4636, Dr. Cohen noted its presence later that year, *id.* at 4664, and Lynn Pohlman noted "no ascites" when describing Rhinehart's "Signs & Symptoms" in July 2011, *id.* 4675. Finally, Dr. Larson noted in November 2011 that Rhinehart's ascites was "controlled" and prescribed a drug protocol. *Id.* at 4691.

EV was also addressed in the course of Rhinehart's care. A hospitalist recommended that Rhinehart be put on beta-blocker drug called Propranolol to mitigate the risks of EV, *id.* at 4663, and Rhinehart subsequently received the drug, *id.* at 4667. The banding procedures Rhinehart received in 2010 and 2011 were also treatments for EV.

All of the treatment set forth here is evidence that Rhinehart was regularly seen for his diagnosed conditions as well as for their complications and symptoms. Even if ascites, hypertension, and EV are properly considered "diagnosed conditions mandating treatment," Plaintiffs have not shown that Rhinehart received no care for them.

Still, Plaintiffs could prevail if they showed that Rhinehart's treatment was so inadequate that he suffered a verified medical injury. Plaintiffs insist the treatment was so inadequate. They claim that because EV is a common complication of ESLD and can "only be detected . . . through EGD scoping," it was incumbent upon Stevenson to order scoping

early on and his failure to do that resulted in Rhinehart's 2010 bleeding episode.[3] ECF 349, PgID 8846. As common as EV might be for patients with ESLD, it does not follow that a failure to order EGD earlier violates the 8th Amendment. Plaintiffs' demand for an EGD is akin to "an unrequited request for a specific type of medical treatment" so they must therefore "establish a causal link between [his] injury and the allegedly inadequate treatment[.]" *King v. Alexander*, 574 F. App'x 603, 606 (6th Cir. 2014). The mere fact that Rhinehart's varices did bleed does not establish causality. And Plaintiffs have not presented the necessary causation evidence, which eliminates their claim. *See id.*

Plaintiffs may (and do) disagree with the treatment Rhinehart received. But Rhinehart was seen and treated for his ESLD, Hepatitis C, and the resulting (or even separate) conditions of ascites, EV, and hypertension. Plaintiffs have not introduced verified medical evidence of harm directly resulting from the treatments' inadequacy. Plaintiffs have not satisfied the objective prong for a deliberate indifference claim so summary judgment for Stevenson is warranted.

4.  Stevenson failed to order monitoring by a gastroenterologist after his June 2010 EGD

Rhinehart underwent an EGD (esophagogastroduodenoscopy) in June 2010. ECF 177, PgID 2420. Dr. Lynn Schachnger performed the procedure and also placed seven esophageal bands "with good results." ECF 259-2, PgID 4705–06. At the conclusion of the procedures, Schachinger recommended that Rhinehart follow up "with the prison gastroeneterologist for additional EGD with esophageal banding as necessary." *Id.* at ECF 177, PgID 2421.

---

[3] Plaintiffs also point to alleged shortcomings after June 2010, but here, the Court only addresses the "meaningful plan of care" argument. The theories of harm resulting from post-June 2010 treatment are addressed more specifically in the sections below.

In light of Schachinger's recommendation, Plaintiffs fault Stevenson for not having Rhinehart monitored by a gastroenterologist. They insist that monitoring—and specifically more EGD scoping—was the only appropriate treatment plan going forward and aver that, had the recommendation been followed, Rhinehart would have avoided a bleeding episode a little more than a year later. Defendants argue that the decisions they made were yet another instance of Defendants simply making medical judgments about Rhinehart's care.

Since Plaintiffs have disclaimed the theory of delayed treatment, they are left to show that either (1) Rhinehart had a diagnosed medical need that mandated treatment or (2) the treatment he did receive was so inadequate that he suffered a verifiable harm as a result.

As to the first theory, Rhinehart did receive treatment. Although Rhinehart was not referred to a gastroenterologist as Schachinger recommended, he had a follow-up visit with a treating physician only a few weeks later. Dr. Cohen reviewed Schachinger's notes but pursued a different treatment than Schachinger had recommended, and instead employed his own medical judgment. *See* ECF 259-1, PgID 4663. Rhinehart was repeatedly evaluated by other doctors up until the October 2011 bleeding episode. *Id.* at 4670–86. Schachinger's recommendation was not a new diagnosis mandating treatment, but only a recommendation. The mere failure to follow it is therefore not cognizable as an Eighth Amendment violation, even if Stevenson had special oversight responsibilities as Rhinehart's "assigned physician."

Further, Plaintiffs have not shown that Rhinehart suffered demonstrable harm from not being specifically referred to a gastroenterologist. As noted, Rhinehart was seen by other doctors and placed on beta blockers to reduce the risk of bleeding. Rhinehart stopped taking the beta blockers several weeks later, ECF 315-2, PgID 7743, but at that point

12

Stevenson's employment had either already ended or ended a week later. ECF 236-3, PgID 5021. So to prevail, Plaintiffs would have to provide verifying medical proof that a gastroenterologist referral in July or August of 2010 would have prevented Rhinehart's subsequent bleeding in October 2011. Plaintiff's proof is that: (1) Rhinehart actually bled (2) Schachinger's testimony about what he would have done if Rhinehart was his patient, ECF 263-13, PgID 5400, and (3) Schachinger's opining that Rhinehart might not have bled if he received the preemptive banding, *id.* at 5411. Although the arguments might perhaps be relevant in a malpractice claim, it is not verified medical evidence, which is required to prevail on an 8th Amendment claim.

Stevenson is therefore entitled to summary judgment on the claim.

5. Stevenson failed to request any specialist consultations after Mr. Rhinehart's June 30 discharge

Plaintiffs also claim that Stevenson's failure to request specialists for Rhinehart after his discharge from the hospital in June 30, 2010 amounted to deliberate indifference. But the claim fails for the same reasons already set forth above. A recommendation that a patient see a specialist is not a medical diagnosis mandating treatment. Rhinehart was receiving treatment, and the verified medical proof requirement applies. Plaintiffs have not introduced any proof that the failure to request specialists in July or August actually caused any harm. Stevenson is therefore entitled to summary judgment on the claim.

6. Edelman failed to act after learning, in February 2010, that Rhinehart had not seen the recommended specialists

Plaintiffs fault Edelman for not having Rhinehart seen by specialists after February 2010. The date is significant because it is when the newspaper article about Rhinehart was published, which in turn initiated a series of internal emails about the care Rhinehart was

13

receiving. The concern at that time was Rhinehart's delayed intake and, specifically, the possibility that he had cancer. *See* ECF 263-12, PgID 5392. But a doctor's recommendation that a patient (who is receiving ongoing treatment) be referred to a specialist is not a diagnosed medical need mandating treatment. *Mattox*, 851 F.3d at 598. The mere failure to ensure that Rhinehart was quickly seen by the recommended specialists is insufficient to state a deliberate-indifference claim; verifying medical proof is necessary. Rhinehart did not actually have cancer and failure to send him to cancer specialists is insufficient to state an 8th Amendment claim. *Id.* Rhinehart's intake was delayed, but Plaintiffs have disclaimed a delay-of-treatment theory, and even if they had not, they have not introduced the requisite verified medical evidence. Edelman is therefore entitled to summary judgment on the claim.

7.    Edelman failed to approve a TIPS procedure

Plaintiffs claim that Edelman was deliberately indifferent when he failed to approve a TIPS procedure after Schachinger recommended one in October 2011. The Report and Recommendation adopted by the Court explained that the decision was "not a mere disagreement among physicians," in part because Edelman "inexplicably rejected Dr. Schachinger's first-hand expert opinion that further banding could not be done" and denied the request for a TIPS procedure. ECF 273, PgID 6586–87. And when the Court adopted the Report, it noted that there was a genuine issue of material fact as to whether Edelman actually employed medical reasoning in making the decision, thereby precluding deference to medical judgment. ECF 284, PgID 6909–10. But Dr. Stieve was deposed after the Court denied the initial motion for summary judgment and his deposition reveals far more detail

as to both his reasons for decisions concerning Rhinehart, as well as the background that informed his decision. The testimony is consequential to the matter at hand.

A. The Underlying Events

Rhinehart was admitted to the hospital in October 2011 after a bleeding episode. Schachinger performed a banding procedure and after the operation, wrote up a report. The report included a seven-point plan of treatment, which read:

1. I called and spoke personally to his nurse to contact his admitting physician and with my recommendations that the patient be started on a stat octreotide drip of 50 micrograms bolus with a 50 microgram per minute drip.
2. The second recommendation was provided that I recommend that the patient be transferred to a tertiary care institution, that a TIPS procedure could be performed to lower his portal hypertension and prevent further bleeding.
3. I feel that the transfer should occur if he has additional bleeding as there is nothing further, I believe, that I can do given all the bands that are already placed on the esophageal varices and those bands would get knocked off trying to treat any additional bleeding and would be ineffective.
4. I would also recommend that the patient remain on a proton pump inhibitor IV as well.
5. The patient may have clear liquids.
6. The patient's prognosis is quite poor and guarded at this time and there is a fair chance that this is going to bleed again and he may bleed to death and I recommend that he be transferred.
7. The above recommendations, again, were given to his nurse personally to pass on to his physician.

ECF 259-2, PgID 4713.

Dr. Mohmmed Al-Shihabi was the hospitalist who saw Rhinehart at that time and he too wrote a report. In it, he restated some of Schachinger's recommendations:

I have discussed the case with Dr. Schachinger who recommended strongly to transfer patient to University of Michigan or St. Joseph's Hospital where they would be able to do a TIPS procedures to decrease the pressure on the portal vein and that will decrease dramatically the chance of re-bleeding from that site of the varices. Dr. Schachinger expressed that if the patient bled again, he cannot do anything about that and the patient might bleed until he died.

ECF 259-2, PgID 4715. According to Al-Shihabi, he then spoke with or contacted several people about transferring Rhinehart; namely the nurse supervisor, Dr. Edelman, Dr. Stieve, and Dr. Lake (who was covering for Dr. King, the chief of staff in the hospital). *Id.* at 4715–16. All told, Al-Shihabi's total time involved was 40 minutes, between personally seeing Rhinehart and discussing his needs with others. *Id.* at 4716.

It bears noting that Al-Shihabi's description misstated, or at least incompletely described, Schachinger's actual recommendation. Point Three of Schachinger's plan is conditional: he should be transferred *if* he has additional bleeding. Point Six is not stated conditionally: "I recommend that he be transferred." In his deposition, however, Schachinger clarified that "the two things go together." ECF 263-13, PgID 5404. Thus, the recommendation was for a transfer in the event of further bleeding. But even so, the prospect of immediately transferring Rhinehart was put before Stieve and Edelman and they declined to transfer him. That decision is what the Court must now review.

B. The Decision

At the outset, Dr. Stieve distinguished between denying a TIPS procedure altogether and denying a transfer to a facility to be evaluated for the procedure. He insisted that the latter was the real decision in issue. During his deposition, he was presented with the documents quoted above and asked whether he "consult[ed] with a gastroenterologist, a hepatologist or a radiologist prior to denying Mr. Rhinehart in conjunction with Dr. Edelman the TIPS procedure[.]" ECF 340-1, PgID 8611. Stieve, however, insisted that he actually did not deny the procedure at all. "I don't believe that I declined the TIPS procedure. I declined to send [Rhinehart] to the University of Michigan for evaluation by such a team for the TIPS procedure." And he reiterated that testimony several more times. *See, e.g.*, ECF

340-1, PgID 8613 ("I contend that I did not disapprove a TIPS procedure. I disapproved a transfer to the University of Michigan since the patient was stable, hadn't rebled, and we had a treatment plan that we thought would be effective in controlling further bleeds, that giving nonspecific beta-blocker therapy and 24 hour health care surveillance, which is available in all of our prisons."). His framing and recollection of the decision is fully consistent with Schachinger's plan of treatment and Al-Shihabi's report.

Plaintiffs insist that Edelman was actually the one who made the decision to deny a transfer and that Stieve "merely 'concurred' with the decision when he was asked, but he neither made nor influenced this decision." ECF 349, PgID 8831 n.1. Their speculation is not borne out by the testimony. Stieve did testify, several times, that he "concurred" with Dr. Edelman that Rhinehart should not be transferred. But this is a far cry from *merely* concurring—i.e., simply following along—or having no influence on the decision. On the contrary, Stieve's contemporaneous notes from the decision confirm that he discussed the merits of Rhinehart's course of treatment with Edelman, discussed the risks with Al-Shihabi, and had an understanding of the reasons for declining a transfer. *See* ECF 259-1, PgID 4689. During his deposition, Stieve explained that in situations like the one before him, "I normally would review the record very carefully, but I can't say whether I did or not because I didn't write it down." ECF 340-1, PgID 8608. But he did affirm that he specifically discussed Rhinehart's case with Al-Shihabi and expounded on the reasons why not transferring Rhinehart would be advisable. *Id.* at 8589–90. And even Schachinger, in his deposition, conceded that there are risks in performing a TIPS procedure about which Edelman and Stieve were rightly concerned. *See* ECF 263-13, PgID 5407. It is therefore

clear that Stieve gave real consideration to Rhinehart's needs and the prospect of a transfer.

Dr. Stieve also established his familiarity with the medical issues involved in the decision. He testified that he dealt daily with patients who had esophageal varices and that "[e]sophageal varices banding was a very common thing for me to be involved with[.]" ECF 340-1, PgID 8589. He likewise testified that he "had been involved with approving other TIPS procedures for other inmates," but considered those inmates to have "different circumstances" because "[t]hey were being released so that they could get a liver transplant." *Id.* at 8590; *see also id.* at 8589 ("I would often evaluate inmates to see whether they were a candidate for a TIPS procedure"). And although he conceded that he was not specifically trained as a gastroenterologist, radiologist, or hepatologist, he could certainly explain how TIPS and banding procedures were performed and what they entailed. *See id.* at 8589–90.

Finally, it is clear that Edelman and Stieve consulted with each other. Al-Shihabi stated in his report that Edelman denied the transfer and "said that we just need to continue monitoring the patient here." *Id.* at 4715. Al-Shihabi stated he then talked to Stieve,[4] who said he (Stieve) denied the transfer. *Id.* Edelman confirmed his own statements to Al-Shihabi, *see* 236-2, PgID 5000, but also added that he had "denied the transfer because he talked to Dr. Stieve about it," *id.* at 5001. Stieve, too, confirmed talking to Al-Shihabi and summarized the conversation:

> Discussed case with Dr Edelman. Pt in Alligiance hospital after banding of bleeding esophygeal varcies. Stable. Hospitalist offered to transfer pt to university of Michigan for TIPS; merits discussed with Dr Edelman. We

---

[4] The report actually says "Dr. Steele, who is Dr. Edelman's boss," ECF 259-2, PgID 4715. The Court reads the phrase as a typographical error.

recognize hypothethical risk of re-bleed. Also risk of morbidity and mortality with procedure, essentially exchanging no change in overall mortality and hypothetical decrease risk of bleed with increase in risk of hepatic encepholapathy. Hospitalist, (SP? Dr Alchebabbe) contacted me to include my name in his documentation for "refusal to transfer" and warned me the pt might die. He added that he was told the gastroenterologist would refuse to "scope the pt if he has a rebleed, as there is nothing else to do" This pt has severe disease and will likely sucumb to it. TIPS was recommended and we declined the intervention due to risks and no overall change in course. We will continue to assess the inmate and supply appropriate care. I am referring this hospitalist to our contractual vendor, Mason Gill, as I believe he was threatening me and the department with his refusal to accept our primary management of the patinet.

ECF 259-1, PgID 4689 (syntax and spellings original).

In light of Stieve's testimony and viewing the evidence in a light most favorable to Plaintiffs, there is no genuine issue of material fact that Edelman employed medical reasoning in making his medical judgment concerning a transfer for a TIPS procedure. Although the precise order of who made the initial denial of transfer is hazy, the record is clear that discussions occurred between Edelman and Stieve and those were informed by medical judgment. The decision not to transfer Rhinehart "amounted to a mere disagreement among medical professionals" and is insufficient to state a claim of deliberate indifference. ECF 273, PgID 6584. Edelman is entitled to summary judgment on the claim.

8.    Edelman failed to approve Rhinehart's requests to be seen by a hepatologist for evaluation and treatment of his liver disease, including consideration for a possible liver transplant

Plaintiffs' final claim revolves around requests made by Rhinehart himself, in contrast to the recommendations made by medical personnel described above. On October 12, 2011, Dr. Edelman saw Rhinehart through telemedicine. ECF 263-9, PgID 5285. Edelman's notes explain that he told Rhinehart that "his liver health is such that he would not be anywhere near qualifying for" a liver transplant and "assured him that we are completely capable of providing treatment for his current issues." *Id.* But Plaintiffs insist that Edelman's

statements were in error, and point to Dr. Schachinger's deposition testimony, the report of their own expert, Dr. Finkel, and medical literature previously cited by the parties in support. *See* ECF 345, PgID 8724–25.

To prevail on a deliberate indifference claim, Plaintiffs must show that Rhinehart had a need diagnosed by physicians as mandating treatment yet Edelman failed to treat him or so inadequately treated him that he suffered a verified medical injury. Rhinehart's diagnosed need was ESLD and he received treatment for it. He did not receive the specific treatment of a liver transplant, "[b]ut a desire for additional or different treatment does not by itself suffice to support an Eighth Amendment claim." *Anthony v. Swanson*, No. 16-3444, 2017 WL 2992224, at *3 (6th Cir. July 14, 2017). Plaintiffs must introduce expert medical testimony "showing the medical necessity" of the requested treatment. *Id.*

At the outset, a patient's request for a specific type of treatment is different than a treating physician's formal recommendation. The record is unequivocal that no physician indicated to Edelman that it was mandatory for Rhinehart to be transferred for transplant consideration. Edelman testified that on-site medical providers requested off-site services by submitting "407" requests, ECF 263-2, PgID 4965, and that he was responsible for reviewing and approving those requests, *id.* at 4966, but that he never received a request for Rhinehart's transfer, *id.* at 4998.

Regardless, Plaintiffs have not presented the necessary verified medical evidence that Rhinehart was harmed from Edelman's failure to transfer him. Schachinger's testimony does not provide proof: in his deposition, he was asked whether, assuming Rhinehart was a patient under his "exclusive care and not just a prisoner patient, one that [he] could control the course of treatment with, following [the 2010] banding procedure," he would

20

make a hepatologist referral concerning Rhinehart's ESLD. ECF 263-13, PgID 5400. He answered that he "probably would have referred [such a patient] to a tertiary care center that performs a liver transplant to see if at some point that might become necessary," but emphasized that the decision to order a transplant would be "up to the hepatologist" as "they deem necessary." *Id.* The testimony neither demonstrates that transferring Rhinehart to be considered for a transplant was a medical necessity nor that failure to transfer him "had, in and of itself," any effect on Rhinehart's health and outcomes. *See Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 779 (6th Cir. 2012).

The same analysis holds true for Dr. Finkel's testimony. Like Schachinger, he is a gastroenterologist, and in his deposition he agreed with Schachinger's assessment concerning a transfer. ECF 263-14, PgID 5442. But Finkel went further: he opined that Rhinehart "would have been a candidate" for a transplant, though he could not say whether he would have received one. *Id.* At most, then, Finkel could speculate about the harm that Rhinehart *might* have avoided in the event that he was *possibly* selected for a transplant—which has purportedly never been performed on a Michigan prisoner. *See* ECF 323, PgID 8065–67.

As for the proffered medical materials: they do little more than speak in the abstract about liver transplants and they are thus merely speculative.

Plaintiffs have failed to introduce verified medical evidence that Rhinehart was harmed by Edelman's failure to have him considered for a liver transplant. Edelman is entitled to summary judgment on the final claim.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that Defendants' Second Motion for Summary

Judgment [340] is **GRANTED**.

**IT IS FURTHER ORDERED** that all other pending motions [317, 319, 331, 333, 335,

336, 338] are **MOOT**.

This is a final order and closes the case.

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: September 7, 2017

I hereby certify that a copy of the foregoing document was served upon the parties
and/or counsel of record on September 7, 2017, by electronic and/or ordinary mail.

s/David P. Parker
Case Manager
